Filed 12/11/13 (unmodified opinion attached)

**CERTIFIED FOR PARTIAL PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>      v.<br><br>TOMIEKIA JOHNSON,<br><br>      Defendant and Appellant. | B239867<br><br>(Los Angeles County<br>Super. Ct. No. BA379826)<br><br>ORDER MODIFYING OPINION<br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on November 26, 2013, be modified as follows:

A new footnote 4 is added to the end of the first full sentence on page 30, after the word slide, which reads as follows:  **Defendant contends that she was prejudiced by the bailiff's demonstration because Keil testified about the operation of the handgun using a diagram of the handgun, and the bailiff demonstrated the operation of the handgun using the actual handgun.  There was no material difference between Keil's testimony using a diagram, and the bailiff's demonstration using the actual handgun.  (Cf. *People v. Duenas* (2012) 55 Cal. 4th 1, 20 [diagrams are demonstrative evidence]; *People v. Collins* (2010) 49 Cal.4th 175, 255-256 [a jury's demonstration and use of a diagram during jury deliberation was not prejudicial jury misconduct because they were based on the evidence admitted at trial].)**

All subsequent footnotes are renumbered.

Petition for rehearing is denied.  No change in judgment.

_____

MOSK, Acting P. J.                                    KRIEGLER, J.

Filed 11/26/13 (unmodified opinion)

**CERTIFIED FOR PARTIAL PUBLICATION**<sup>∗</sup>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B239867 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA379826) |
| v. | |
| TOMIEKIA JOHNSON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of the County of Los Angeles, Robert Perry, Judge.  Affirmed.

Fay Arfa for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Lawrence M. Daniels, Supervising Deputy Attorney General, William H. Shin, Deputy Attorney General, for Plaintiff and Respondent.

---

∗        Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of **BACKGROUND**, parts **A2 and A3**, and **DISCUSSION**, parts **A** and **C through G**.

## INTRODUCTION

Defendant and appellant Tomiekia Johnson (defendant) was convicted of the first degree murder of her husband, Marcus Lemons (Lemons). (Pen. Code, §§ 187, subd. (a), and 189.[1]) On appeal, defendant contends, inter alia, that her statutory and constitutional rights to be present at trial were violated when the trial court, without defendant being present, allowed the bailiff to demonstrate the operation of the murder weapon in response to a jury request and to respond to questions from the jury about how the weapon operated.

In the published portion of this opinion, we hold that the trial court erred by allowing the bailiff, without the presence of defendant, to conduct for the jury a demonstration of how the murder weapon operated and answer jury questions about that subject, but that error was not prejudicial because defendant was present when the prosecution's expert provided testimony that was consistent with the bailiff's communications with the jury. The failure of defendant's counsel to object to the colloquy between the bailiff and the jury forfeited any contention concerning that process. We affirm the judgment of conviction.

## BACKGROUND

### A.    Factual Background

#### 1.    *Summary of Evidence*

A surveillance video from the inside of a bar showed Lemons and defendant drinking at the bar on February 21, 2009. Later that evening, the driver of a car and her passenger observed a physical altercation between a female and a male outside their car and noticed that when the female departed in the couple's car, they only saw the female's

---

[1]    All statutory citations are to the Penal Code unless otherwise noted.

head; neither the driver nor her passenger saw the male. They testified the man and woman were African Americans, and that the man wore a baseball hat. Their description of the couple's appearance was consistent with the physical appearance of defendant and Lemons in the video at the bar, and with the hat subsequently recovered near Lemon's body.

In response to a 911 call from defendant's mother, the police found Lemons's body in defendant's car parked outside her mother's house. Lemons had suffered a fatal gunshot wound to the head. Defendant was arrested. The police found in the car a .25 caliber semiautomatic handgun, loaded with a magazine containing five rounds and one round in the chamber. Just behind the driver's seat there was an expended .25 caliber shell casing. The hammer on the gun was in the cocked position, and the safety lever was in the center position.

A deputy medical examiner concluded that based on the trajectory of the bullet and the wound, the gun was in a position above and to the right of Lemons when it was fired and that the gun was in contact or near contact with Lemons's head. She further opined that Lemons was seated on the front passenger seat, and the shooter was standing near the front passenger door frame.

At the time of the shooting, defendant was a seven-year veteran California Highway Patrol (CHP) officer. Nevertheless, she had a past history of making threats, firing her weapon, and engaging in threatening conduct, including, inter alia, against Lemons.

According to defendant, she and Lemons argued on the way home from the bar on the evening of February 21, 2009, and she exited the car to walk home. She thought Lemons was going to reach for a gun that she believed was in her purse that she left in the car. Lemons was in the passenger seat with one foot on the ground. When defendant saw the gun on the ground on the passenger side of the car, she was afraid Lemons would get it so she picked it up, squeezed the gun tightly, and, in so doing, it fired accidentally striking Lemons. She drove him to her parents' house and told them to call 911 because she had shot and killed Lemons. Defendant's firearms and trajectory reconstruction

3

expert said that Lemons did not suffer a contact wound and that there was not sufficient evidence to determine Lemons's position when he was shot.

### 2. Prosecution Evidence

#### a) The Incident

Portions of a February 21, 2009, video recording of the interior of a TGI Fridays bar (TGIF) located in the City of Compton depicting defendant and Lemons were played for the jury. The parties stipulated that defendant and Lemons arrived at TGIF on February 21, 2009, about 9:00 p.m. It appeared from the video recording that both defendant and Lemons were African-American and defendant had straight hair that was slightly shorter than shoulder length. Lemons wore a baseball cap.

Los Angeles County Sheriff's Department (LASD) Detective Frank Salerno testified, based on the TGIF video recording that defendant, a CHP officer, and her husband Lemons were at TGIF, and at some point defendant left Lemons and went to the other side of the bar to talk to a man. For approximately 17 minutes, defendant sat next to the man. They talked, whispered and hugged each other. During this time, Lemons talked to a friend on his cell phone. Lemons then motioned defendant to return to his side, and she complied. Lemons seemed to be restless, repeatedly standing up and sitting down on his bar stool. While at TGIF, defendant drank two shot glasses of alcohol and a beer, and Lemons drank one shot glass of alcohol and one beer. After defendant paid the bill, she and Lemons left TGIF together at about 10:47 p.m.

Janie Wright testified that on February 21, 2009, she was watching a movie at the Lakewood Mall located at 5200 Faculty Avenue in Lakewood with her daughter and three nieces. The movie ended at 10:23 p.m. Approximately 10 minutes after the movie ended, Wright and the girls returned to their parked vehicle and left.

While traveling to her niece's house in Compton, Wright stopped her vehicle at a red light on Wilmington, near Central. Wright and Ashley Young, one of Wright's nieces, testified that they noticed a silver—or gray—colored car parked on the side of the

4

road.  They observed a physical altercation between the female driver and the male passenger.

According to Young, the female driver exited the vehicle and went to the rear of the vehicle.  The male exited from the vehicle's passenger side and met the female driver near the rear of the vehicle.  The female was "just going crazy basically"—she "charg[ed] toward[s]" the male and hit him several times with her closed fists.  The man tried to block the woman's blows.  The man eventually backed up against the open front passenger door and fell into the car, and the woman got on top of him in the car.

Young testified that she momentarily lost sight of the incident, and when she regained sight of it, she saw the woman slam the passenger door shut, return to the driver's seat, and drive off "really fast."  Wright testified that she only saw one head inside the vehicle and concluded, "Well, maybe he's sitting on the cur[b] . . . or maybe he's walking away."  Wright continued to look for the man, but did not see him.

Both Wright and Young testified that the couple was African-American, and the man wore a baseball cap.  Wright testified that the woman had "pressed" bobbed hair, and her hair extended below her ears.

At approximately 11:00 p.m., in response to a 911 call from defendant's mother, LASD Deputy Curtis Brown went to the mother's house to investigate a report of an assault with a deadly weapon and a gunshot victim.  When Deputy Brown arrived at the location, he saw defendant standing in the driveway with her vehicle parked in the front of the house.  Deputy Brown detained defendant, placed her in the back of his patrol vehicle, and noticed a strong odor of alcohol emanating from her.  Inside defendant's BMW, Deputy Brown found the body of Lemons, who was deceased, with a gunshot wound to the right side of his upper forehead.

At approximately 2:00 a.m. on February 22, 2009, LASD Detective Steve Rubino arrived at the house of defendant's mother.  Detective Rubino found a purse on the floorboard of the driver's seat of defendant's vehicle, inside of which were various items belonging to defendant, as well as a .25 caliber semiautomatic handgun.  The gun was loaded with a magazine that contained five rounds, and there was one round in the

5

chamber. On the left rear floorboard directly behind the driver's seat, there was an expended .25 caliber shell casing. The hammer on the gun was in the cocked position, and the safety lever was in the center position. In the driver's side cup holder, there was a Styrofoam cup half-filled with wine. In between Lemons's legs, on the passenger seat floorboard, Detective Rubino found a baseball cap.

b)      Forensic Evidence

i)      Dr. Lisa Scheinin

Dr. Lisa Scheinin, a deputy medical examiner with the Los Angeles County Department of Coroner, conducted the autopsy on Lemons's body. Lemons had a gunshot wound to the right side of the forehead close to the hairline. The direction of the wound went from right to left, front to back, and downward. Lemons also had a bruise on the edge of his left forearm and a scratch on his right forearm close to the wrist. Both forearm injuries were consistent with defensive wounds. Based on the bullet's trajectory, Dr. Scheinin concluded that the gun was in a position above and to the right of Lemons when it was fired.

In Dr. Scheinin's opinion, Lemons died of a contact or near contact wound. She explained that her opinion was based on the fact that no stippling or soot, which are deposits from the explosive gases leaving the muzzle ahead of the bullet, were found around the wound or on Lemons's skin, but there was soot on the thick membrane surrounding the surface of Lemon's brain. Dr. Scheinin added that Lemons suffered a contact wound or "even a tight contact wound" because the soot was "pushed all the way into the wound track rather than being on the surface." Based on the bullet trajectory, the blood flow, and the vomit pattern, it was Dr. Scheinin's opinion that Lemons was seated on the front passenger seat while the shooter was standing near the passenger door frame. The toxicology results showed that at the time of his death, Lemons had a blood alcohol content of between .03 and .07, as well as traces of marijuana in his system.

### ii) Robert Keil

LASD senior criminalist Robert Keil testified that he recovered a handgun from defendant's purse located on the driver's side floorboard, and a bullet cartridge on the left rear floorboard. The handgun, a model Titan .25 caliber semiautomatic pistol, was admitted into evidence. The bullet fragments found inside Lemons's body and the casing found in the backseat of defendant's vehicle came from the recovered pistol.

Keil asserted that he was proficient with guns and testified extensively about the characteristics and operation of the gun used to kill Lemons. According to Keil, the Titan pistol operated in a single-action mode; it was not a double-action firearm; and the weapon had a maximum capacity of nine rounds, with eight rounds in the magazine and one additional round in the chamber. Keil performed a "trigger pull test" and determined that to pull the trigger and cause the hammer to release required approximately seven and a half pounds of force, slightly less than the weight of a gallon of milk.

Keil examined the bullet hole on the baseball cap found near Lemons and found traces of gun powder in the fabric. Based on his analysis of the residue left on the baseball cap, he opined that the shot was fired in "contact or loose contact, meaning that the muzzle was either pressed against the fabric or just slightly removed from the fabric"—no more than a quarter of an inch away from the target. This conclusion was supported by the fact that Keil found discoloration on tissue samples of Lemons's brain membrane, consistent with soot caused by gun powder, as well as red fibers from the baseball cap fabric inside the wound.

Based on, inter alia, the contact or loose contact bullet hole found on the baseball cap, the bullet trajectory, and the vomit drippings on the chest, inner thighs, and cap, Keil also opined that when the shot was fired the shooter was positioned outside of the car and inside an open door, standing above Lemons with the gun pressed against Lemons's head. He said that an accidental discharge following a drop of the weapon was inconsistent with the contact wound on Lemons.

c)      Defendant's Law Enforcement Experience and Training

Defendant was hired by CHP as a cadet in September 2002 and graduated from the CHP Academy on March 14, 2003.  After graduation, defendant worked, inter alia, as a field officer in the West Los Angeles area and as a member of the Cal Grip detail that assisted contract cities with gang suppression.

Defendant had extensive firearm training.  All CHP officers were trained to carry their handgun in a double-action mode, meaning the hammer and the slide of the weapon were not pulled back, thus requiring greater force to pull the trigger to fire

d)      There Was Evidence of Prior Threats and Acts of
        Defendant Including Those Directed at the Victim

i)      Defendant's burning of a basketball shirt on the
        vehicle of a person she dated in college

Corey Jones testified at trial that in about October 1997, he dated defendant while they attended California State University at Dominguez Hills.  When defendant found out that Jones was seeing another woman, she went to the woman's apartment, found Jones in the bedroom, and told the woman, "If my knee wasn't messed up, I'd whoop your ass." The next day, Jones found on his car a burned basketball shirt he had given to defendant. When Jones later confronted defendant about why she had burned his shirt, defendant said, "Yeah, because you lied.  You was messing with Chavronne.  I knew you was." Defendant seemed aggressive to Jones.

ii)      Defendant's threats to at the shoot house of a person
         she dated in college, and breaking of vehicle windows

William Hall testified that he met defendant while they attended California State University at Dominguez Hills together.  In December 1998, defendant was dating Hall's roommate, Kedrean Terrell.  One evening, after defendant and another friend returned home from a party, defendant climbed over a locked eight-foot tall gate and began

8

banging on a window. When Hall asked defendant what she was doing, defendant laughed and shouted, and angrily said, "I'll have somebody come shoot your house up." She mentioned someone by name from the Tragniew Park Crip gang. Hall took the threat seriously. Terrell came home shortly thereafter and, in Hall's presence, called defendant on the phone. During the phone call, Hall heard defendant repeat the same threat to Terrell.

Hall testified that the next morning he saw that someone had "smashed" out the windows of several cars parked outside his house—his two vehicles, Terrell's vehicle, and a neighbor's vehicle. Hall filed a police report and went to defendant's mother's house to confront defendant. While talking to defendant's mother, Hall heard defendant screaming from one of the rooms in the house, "Yeah, I did it."

                         iii)     Defendant and Lemons arguing and defendant shooting into the air

Derrick White testified that when Lemons and defendant were dating, White was with Lemons at an apartment complex defendant owned. Defendant arrived and brought some hard alcohol. She and Lemons drank some of it. At one point, defendant accused Lemons of looking at "some type street walker chick walking down the street." Defendant "kind of went off" on Lemons and said, "Is this what you want? Is this what you looking at, this kind of bitch?" Shortly thereafter, White heard a gunshot. Lemons ran inside the house laughing and said, "Man, this girl is crazy. She just shot a gun up in the air."

                         iv)     Defendant shooting at a concrete freeway embankment

Darren Stillwell testified that in 2008, he was at one of defendant's apartment buildings with defendant and Lemons. There was a homeless woman in the back of defendant's property, and defendant told her to leave. Defendant was visibly upset. As the homeless woman was walking away from the property, Stillwell saw defendant grab a

gun out of her silver BMW and shoot into a concrete freeway embankment. Stillwell said to Lemons, "Man, your wife is crazy." Lemons responded, "Yes, I know that."

v) Defendant's statements that she carried a gun

June Collier had known defendant for 30 years because her son and defendant grew up together. She testified that she heard defendant state on a few occasions that she was "always carrying" a gun or that she was "always strapped." Defendant once became upset at another person while bowling, and Collier heard defendant say, "They don't want to mess with me. I'm always strapped." Felecia Tripp testified that in December 2008, while attending a birthday party at a Holiday Inn, she heard defendant say, "Don't worry, I got my . . . gun in my . . . shoe."

vi) Other arguments between defendant and Lemons
and defendant's physical altercations

Collier testified that she often participated in bowling tournaments in which both defendant and Lemons also participated. She had seen "[q]uite a few" disagreements between defendant and Lemons, and defendant "pretty much [yells] when she's had a few [drinks]." She saw defendant throw a small bowling supplies bag at Lemons after they had "a few words," and defendant place her hand on Lemon's face while arguing with him. On one occasion, defendant said that "she sometimes fe[lt] like killing [Lemons] and that she kn[ew] she could get away with it." Defendant told Collier, "[H]e just pisses me off."

Collier testified that when they were in Las Vegas, she heard defendant and Lemons arguing, and thereafter heard a slap. When Collier asked them what had happened, neither defendant nor Lemons said anything.

Collier testified that there were arguments between defendant and Lemons and that defendant was the aggressor in each of them. Collier also said that defendant "was always okay until she had a few [drinks]."

10

Tommy Newman testified that several years prior to trial, he saw defendant angrily grabbing Lemons's shirt at a bowling alley. Defendant complained about Lemons "not making any money at the barber shop," "their wedding ring was cheap," and that she "didn't like any of [Lemons's] friends. . . ."

Tripp testified that in July 2008, she was staying in a Las Vegas hotel room adjacent to the room of Lemons and defendant while attending a bowling tournament. One evening, Tripp heard defendant and Lemons arguing loudly in their room. Defendant asked Lemons, "Who are you looking at?" Lemons repeatedly answered, "Stop trippin'." Tripp heard a tap on the wall followed by Lemons stating, "You threw an iron at me," and calling defendant "a bitch." Tripp heard Lemons repeatedly say, "Get off me." A few minutes later, she heard Lemons say "I'm out of here." Lemons exited through the door, slamming the door behind him. The following morning Tripp saw three long scratches on Lemons's neck consistent with fingernail scratches, and defendant with ice on her wrist.

### vii) Defendant's search of Lemon's cellular telephone information

CHP Officer James Jefferson testified that in 2008, he attended a New Year's Eve party with defendant and Lemons. Defendant had been drinking and appeared to be "a little tipsy," but not drunk. At one point in the evening, defendant became upset with Lemons for receiving text messages on his cellular telephone. Defendant yelled at Lemons, "Give me the phone." Defendant took the phone from Lemons, went outside to the balcony, and began searching through the information on the telephone. Defendant apparently did not find what she was looking for and returned inside the party much calmer than when she went outside. She gave the telephone back to Lemons. According to Officer Jefferson, defendant had a reputation at work for being an excessive drinker.

### 3.    *Defendant's Evidence*

#### a)    Defendant's Testimony

Defendant testified that she attended California State University at Dominguez Hills. In 2002, she graduated from the CHP Academy. She was employed by the CHP as a patrol officer and was assigned to the Cal Grip Program, a gang suppression program in partnership with other local law enforcement agencies. She had also had been assigned to headquarters as a recruiter. Defendant met Lemons in 2005. Shortly after defendant began dating Lemons, Lemons moved into her house. In September 2006, defendant and Lemons married.

Defendant testified about numerous incidents during which Lemons physically and emotionally abused her. Defendant and Lemons discussed getting divorced on several occasions. Defendant thought about leaving Lemons, but he threatened that she would never see him or their daughter again. On February 15, 2009, Lemons promised not to touch defendant again and that he would leave her as soon as they got home. After they returned home and Lemons did not leave as promised, defendant decided to leave Lemons.

Defendant testified that on February 21, 2009, she picked up Lemons from his parents' house and they went to dinner at El Torito, a Mexican restaurant. During dinner, defendant and Lemons each had two margaritas. After dinner, at approximately 9:00 p.m., Lemons and defendant went to TGIF in the city of Compton and ordered two beers and two shots of Patron alcohol. At some point, defendant spoke to a male friend on the other side of the bar. When she returned to Lemons, she saw that Lemons was very upset. Lemons complained about how long she had been gone talking to her friend. When other people at the bar began staring at them, defendant told Lemons that she wanted to go home. Defendant paid the bill, and they left TGIF.

Defendant testified that she and Lemons got into their car and defendant began driving. Lemons continued to yell at defendant, calling her a "disrespectful ass bitch and ho." While defendant was driving, Lemons grabbed her neck and began choking her.

12

Lemons said "I'll kill your ass, bitch." Defendant exited the freeway on the Central off-ramp and stopped the vehicle. Defendant told Lemons, "You can walk home." Lemons responded, "No, bitch, you gonna walk home," and "snatched" the vehicle keys out of the ignition. Defendant decided to walk to her mother's house and reached for her purse on the driver's side floorboard. Lemon's "snatched" the purse from her. Afraid that he would remove the gun from her purse, defendant exited the car and ran away.

Defendant testified that when she stopped running, she was ten to fifteen feet from the car. She turned around and saw Lemons fumbling in the car. She believed he was looking for the gun. Defendant then saw the gun on the ground one to two feet away from Lemons and the car. Lemons was in the passenger seat, with his door fully open and one foot in the vehicle and one foot on the ground. Afraid that Lemons would find the gun and shoot her, she ran to retrieve it. Defendant picked up the gun. Defendant testified that she did not know whether the gun had the safety on, or whether "the hammer was cocked." Expecting a struggle over the gun, defendant squeezed the gun tightly and it fired accidentally. After she picked up the gun from the ground, she had not come up very far and was between the passenger door and Lemons when it fired. Defendant said that she obtained the recovered handgun from her aunt.

Defendant testified that she placed Lemons's leg inside the car, drove to her parents' house, parked the car in the middle of the street, and ran to the front door. When her father came to the door, defendant told him to call 911 because she had shot Lemons and he was dead. Shortly thereafter, the police arrived and defendant was taken to the Sheriff's station and interviewed about the shooting.

### b)	Forensic Evidence

Jacobus Michiel Swanepoel, defendant's expert on firearms and trajectory reconstruction, testified that a .25 caliber Titan pistol was a single-action only handgun, and "[w]hat I mean by single action is that you actually have to cock the hammer back manually or rack the slide back manually for the first time to facilitate the trigger being in a position to be pulled and for a subsequent shot to be fired." Swanepoel opined that

13

Lemons did not suffer a contact wound because there was not enough soot or partially burned and unburned powder particles inside the wound track, and there was no burning or searing of the wound. Also, unlike what he would expect with a contact wound, no blood had been found on the gun. Swanepoel testified that the photographs of Lemons's baseball cap did not show that Lemons suffered a contact wound because there was not enough "burning" on the baseball cap. Swanepoel also testified that there was insufficient information to form an opinion as to Lemons's position in the car at the time he was shot because the bullet never exited Lemons's head, and none of the physical evidence was "discriminative" enough to determine Lemons's position when he was shot.

## B.     Procedural Background

The Los Angeles County District Attorney filed an information charging defendant with one count of murder. (§ 187, subd. (a).) It was alleged that defendant personally and intentionally discharged a firearm which caused great bodily injury and death (§12022.53, subd. (d)), that defendant personally and intentionally discharged a firearm (§ 12022.53, subd. (c)), and that defendant personally used a firearm (§ 12022.53, subd. (b)).

The jury found defendant guilty of first degree murder and the firearm allegations true. The trial court sentenced defendant to state prison for a term of 50 years to life.

## DISCUSSION

## A.     Sufficiency of Evidence for First Degree Murder

Defendant contends that there is insufficient evidence to support her conviction for first degree murder because there is no evidence that the crime was premeditated and deliberate. We disagree.

14

*1. Standard of Review*

"'In reviewing the sufficiency of evidence under the due process clause of the Fourteenth Amendment to the United States Constitution, the question we ask is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."' ([*People v.*] *Rowland* [(1992)] 4 Cal.4th [238,] 269 . . . .)  We apply an identical standard under the California Constitution.  (*Ibid*.)  'In determining whether a reasonable trier of fact could have found defendant guilty beyond a reasonable doubt, the appellate court "must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence."'  (*People v. Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738].)"  (*People v. Young* (2005) 34 Cal.4th 1149, 1175.)  In reviewing the sufficiency of the evidence, "a reviewing court resolves neither credibility issues nor evidentiary conflicts.  [Citation.]  Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact.  [Citation.]"  (*Id*. at p. 1181.)  We reverse for insufficient evidence only if "'"'"upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].'"'"'  (*People v. Manriquez* (2005) 37 Cal.4th 547, 577.)


*2. Analysis*

Murder is the unlawful killing of a human being with malice aforethought.  (§ 187, subd. (a).)  First degree murder includes any unlawful and intentional killing that "was willful, deliberate and premeditated."  (§ 189.)

"An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse."  (*People v. Stitely* (2005) 35 Cal.4th 514, 543.)  "'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance.  [Citations.]  'The process of premeditation and deliberation does not require any extended period of time.  "The true test is not the duration of time as much as it is the

15

extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . .” [Citations.]’ [Citation.]” (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080.) “The act of planning—involving deliberation and premeditation—requires nothing more than a ‘successive thought[ ] of the mind.’ [Citations.]” (*People v. San Nicolas* (2004) 34 Cal.4th 614, 658.)

In *People v. Anderson* (1968) 70 Cal.2d 15, 26-27 (*Anderson*), the Supreme Court described three categories of evidence relevant to finding premeditation and deliberation: “(1) facts about how and what defendant did prior to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as ‘planning’ activity; (2) facts about the defendant’s *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a ‘motive’ to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of ‘a pre-existing reflection’ and ‘careful thought and weighing of considerations’ rather than ‘mere unconsidered or rash impulse hastily executed’ (*People v. Thomas* [(1945)] 25 Cal.2d 880, at pp. 898, 900, 901); (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a ‘preconceived design’ to take his victim’s life in a particular way for a ‘reason’ which the jury can reasonably infer from facts of type (1) or (2).” (See also *People v. Mayfield* (1997) 14 Cal.4th 668, 768.)

The factors set forth in *Anderson*, *supra*, 70 Cal.2d at pages 26-27, are not the exclusive means for establishing premeditation and deliberation. (*People v. Lenart* (2004) 32 Cal.4th 1107, 1127.) “Unreflective reliance on *Anderson* for a definition of premeditation is inappropriate. The *Anderson* analysis was intended as a framework to assist reviewing courts in assessing whether the evidence supports an inference that the killing resulted from preexisting reflection and weighing of considerations.” (*People v. Thomas* (1992) 2 Cal.4th 489, 517.)

Based on the evidence, a reasonable juror could have found that defendant acted with deliberation and premeditation. There is evidence that defendant fired a single shot

16

at close range into Lemons's head while he was seated on the front passenger seat and defendant was standing above him outside the car. Dr. Scheinin testified that Lemons suffered a gunshot wound to his forehead that went from right to left, front to back, and downward, and opined that Lemons suffered a contact wound because soot was found "pushed all the way inside the wound track rather than being on the surface." Keil testified that the presence of gunpowder on the fabric of the baseball cap as well as the fact that fabric fibers were found inside the wound indicated that the shot had been fired at a "very close range." Keil opined that the gun was "either touching or just slightly removed" from Lemons's head when the shot was fired, and that was consistent with Keil's conclusion from his investigation that at the time Lemon was shot, he was seated in the front passenger seat with both of his legs on the floorboard facing forward. "This manner of killing, a close-range shooting without any provocation or evidence of a struggle, reasonably supports an inference of premeditation and deliberation. [Citation.]" (*People v. Thompson* (2010) 49 Cal.4th 79, 114-115.)

There is also evidence that defendant was an experienced peace officer who regularly participated in monthly and annual firearms training. Keil estimated that the pistol had a trigger pull of approximately seven and a half pounds, meaning a significant force—a force slightly less than the weight of a gallon of milk—was required to pull the trigger and cause the weapon to fire. In addition, the pistol had a safety mechanism that must be physically rotated before the weapon can fire.

A reasonable juror could have found that defendant's act of shooting Lemon was the result of deliberation and premeditation and not the result of a rash impulse or mistake. Accordingly, substantial evidence supports the jury's finding of premeditation and deliberation.

### B.     Right to be Present

Defendant contends that her statutory and constitutional rights to be present at trial were violated when, without her presence, the trial court in response to a jury request allowed the bailiff to demonstrate, and answer questions about, the operation of the

murder weapon. As set forth above, the evidence at trial showed that after an evening of drinking, defendant and Lemons argued on their way home from a bar. After defendant stopped and exited her vehicle, she shot Lemons at close range with a handgun while he was seated in the passenger seat of the car. Defendant claimed that the handgun discharged accidentally, but, after considering the evidence, including expert witness testimony about the operation of the handgun, the jury rejected that claim. We conclude that although the trial court erred, the error was harmless.

### 1.    Applicable Law

The California Supreme Court has summarized the law relating to a criminal defendant's right to be present at proceeding as follows: "'A criminal defendant's right to be personally present at trial is guaranteed under the federal Constitution by the confrontation clause of the Sixth Amendment and the due process clause of the Fourteenth Amendment. It is also required by section 15 of article I of the California Constitution and by sections 977 and 1043.' [Citation.] 'Under the Sixth Amendment, a defendant has the right to be personally present at any proceeding in which his appearance is necessary to prevent "interference with [his] opportunity for effective cross-examination."' [Citations.] 'Due process guarantees the right to be present at any "stage that is critical to [the] outcome" and where the defendant's "presence would contribute to the fairness of the procedure."' [Citations.] '"The state constitutional right to be present at trial is generally coextensive with the federal due process right. [Citations.]" [Citation.] Neither the state nor the federal Constitution, nor the statutory requirements of sections 977 and 1043, require the defendant's personal appearance at proceedings where his presence bears no reasonable, substantial relation to his opportunity to defend the charges against him. [Citations.]' [Citations.] 'Defendant has the burden of demonstrating that his absence prejudiced his case or denied him a fair trial.' [Citation.]" (*People v. Blacksher* (2011) 52 Cal.4th 769, 798-799, fn. omitted.)

The California Supreme Court has noted that "a defendant may ordinarily be excluded from conferences on questions of law, even if those questions are critical to the

18

outcome of the case, because the defendant's presence would not contribute to the fairness of the proceeding." (*People v. Perry* (2006) 38 Cal.4th 302, 312; *People v. Lopez* (2013) 56 Cal.4th 1028, 1051 [a defendant does not have the right to be present in chambers or at bench discussions outside the jury's presence on questions of law]; *People v. Butler* (2009) 46 Cal.4th 847, 865 [discussion of jury instructions is not a critical stage of the proceedings requiring a defendant's presence]; *People v. Rogers* (2006) 39 Cal.4th 826, 855-856 [a defendant's right to attend a counsel's jury screening discussions]; *People v. Avila* (2006) 38 Cal.4th 491, 598 [rereading of testimony is not a critical stage of a criminal proceeding]; *People v. Riel* (2000) 22 Cal.4th 1153, 1196 [the defendant's presence at discussions concerning television coverage, jury instructions, or which exhibits to send to the jury "would neither have contributed to the fairness of the procedure nor have affected the fullness of his opportunity to defend against the charges"]; *People v. Ervin* (2000) 22 Cal.4th 48, 72 [a defendant has no absolute right to be present during a hardship screening]; *People v. Johnson* (1993) 6 Cal.4th 1, 17-20 [the dismissal of a juror for misconduct is not a proceeding at which the defendant must be present], disapproved on other grounds in *People v. Rogers, supra,* 39 Cal.4th at p. 879; see also *Kentucky v. Stincer* (1987) 482 U.S. 730 [a defendant may be excluded from a conference on the competency of child witnesses]; *United States v. Gagnon* (1985) 470 U.S. 522, 526-527 [trial court's ex parte discussion with a juror was not at a critical stage of the proceedings].)

The California Supreme Court also has explained, "Erroneous exclusion of the defendant is not structural error that is reversible per se, but trial error that is reversible only if the defendant proves prejudice. [Citations.]" (*People v. Perry, supra,* 38 Cal.4th at p. 312.) "'A defendant claiming a violation of the right to personal presence at trial bears the burden of demonstrating that [the defendant's] personal presence could have substantially benefited the defense. [Citation.]' [Citations.]" (*People v. Price* (1991) 1 Cal.4th 324, 408, superseded by statute on other grounds as stated in *People v. Hinks* (1997) 58 Cal.App.4th 1157, 1161.) As the Court of Appeals for the Ninth Circuit pointed out, "The [United States] Supreme Court has 'adopted the general rule that a

19

constitutional error does not automatically require reversal of a conviction . . . and has recognized that most constitutional errors can be harmless.' [Citation.] Automatic reversal due to a constitutional error is required only if this error was a 'structural defect' that permeated 'the entire conduct of the trial from the beginning to end' or 'affected the framework within which the trial proceeds.' [Citation.] If the error was simply a 'trial error,' on the other hand, a court conducts a harmless-error review. [¶] The list of structural errors that the Supreme Court has recognized is short and limited. . . . [¶] The [United States] Supreme Court has never held that the exclusion of a defendant from a critical stage of his criminal proceedings constitutes a structural error. To the contrary, in *Rushen v. Spain*, 464 U.S. 114, 117, 78 L.Ed.2d 267, 104 S.Ct. 453 (1983) (per curiam), the Court determined that the fact that the defendant was denied the right to be present during an ex parte communication between the judge and a juror was a trial error that was subject to harmless error analysis. The court explained that the right to be present during all critical stages of the proceedings and the right to be represented by counsel, 'as with most constitutional rights, are subject to harmless error analysis unless the deprivation, by its very nature, cannot be harmless.' *Id.* at 117 n.2 (citations omitted)." (*Campbell v. Rice* (9th Cir. 2005) 408 F.3d 1166, 1171-1172.) Thus, an error pertaining to defendant's presence involving a federal constitutional right is evaluated under the "harmless-beyond-a-reasonable-doubt standard." (*People v. Davis* (2005) 36 Cal.4th 510, 532; see *Chapman v. California* (1967) 386 U.S. 18, 23.)

### 2. Forensic Evidence

#### a) Criminalist Keil

Keil, an LASD senior criminalist, testified about the operation of the handgun recovered from the purse found in defendant's car. Keil used a photograph of a firearm to, as he testified, "depict[] the hammer, which is in this particular position in the forward or uncocked position. . . . The trigger, which is essentially connected to the firearm to the position that holds the hammer in a cocked position so that when it's depressed, the

hammer can be released. . . . The slide, which is the part that moves back and forth on a semiautomatic firearm such as this. It controls the operation after firing, the removal, extraction, and ejection of a fired cartridge case. That is the purpose of this slide mechanism as it comes to the rear, pulls that out, extracts and ejects that. As it comes forward, takes another live round off the magazine and chambers it. [¶] The safety mechanism. In this case it's a lever-type safety on the left side of the firearm that swings in this example 180 degrees. So as depicted, this is in a ready-to-fire position. If it were rotated 180 degrees to the front, it would be in a safe position."

Using another photograph of a gun, Keil explained, "This particular safety mechanism on this firearm rotates 180 degrees. It has what's known as a detent or a depression in the frame that as you push it around to engage the safety, it sort of holds it or keeps it there more tightly. So in this position it's held in the . . . completely off position, [and] can be rotated around using typically your thumb. If you're right-handed, you'd use your right thumb to rotate it around and engage it in the forward position which would be safety on. [¶] In this particular firearm, . . . [t]he safety will be engaged from six o'clock or greater, meaning that you cannot pull the trigger. [¶] If it's between six o'clock and three o'clock, you will be able to fire the firearm. So it will discharge."

Keil testified that there was an "F" on the gun. According to Keil, when the "F" was showing, the gun was ready to fire. He stated, "F is for 'fire,' meaning that it will discharge with the safety in the position as depicted. [¶] . . . [¶] [If I move the safety lever] instead of an F, underneath the lever as it is right now you would see an S for 'safe.'"

Keil further testified that he had test-fired the pistol and determined it was functional. He also performed a "push off" examination, which is a test performed by using one's thumb to push down the cocked hammer in an attempt to disengage its mechanism without touching the trigger. Keil determined that he could not disengage the hammer with his thumb.

The prosecutor asked Keil, "Can you tell us how this gun works? [¶] You called it a single-action." Keil responded that as opposed to a double action firearm, "a single-

21

action mode of fire, means that the hammer must be in a cocked position before you attempt to fire it. So the operator can thumb it back, meaning they pull it to the rear where it's held by the internal mechanisms of the firearm until the trigger is depressed, in this case [requiring] at least seven and a half pounds of force, at which time the firearm will release the hammer, the hammer will fall forward, strike the firing pin, the firing pin will ram itself into the primer, causes sparks and flame to go into the gunpowder. That expanding gas operates the top of the firearm known as the slide, bullet leaves down range, slide moves to the rear, and what this does is pulls that fired cartridge case out of the chamber, extracts it and ejects it free of the firearm. As the slide gets all the way to the back and starts moving forward, it takes another live round, if it's present in the magazine, and pushes it into the chamber at the same time recocking the hammer. [¶] The operator then would release the pressure from the trigger and re-depress it if they wish to fire it a second time, hence the name 'semi-automatic.' The trigger can't be held to the rear and continue to be fired. You must release it and re-depress it for subsequent shots."

Using a Titan .25 caliber semi-automatic pistol, i.e., the same type of weapon used in Lemons's shooting, Keil further explained its operation, stating, "[A]t this point the firearm is in a cocked position because the slide has been to the rear. The hammer is held to the rear. . . . If this had been loaded with a unit of ammunition, it would be in a position where it could be fired. In this case the safety mechanism is on. The operator would rotate it to the rear, at which point I could apply pressure to the trigger, and the hammer will discharge. The hammer will fall forward striking the firing mechanism and then beginning the process of a cycling where the fired cartridge case will come out of this part on the top and to the rear, and the next live round will come forward as it moves forward. Again, cocking the hammer. [¶] . . . [¶] So that is the operation of this. It is a single-action, meaning that the hammer must be in a cocked position to fire. If it is not, pulling the trigger accomplishes nothing. It does not function. In a cocked position, putting seven and a half pounds of pressure on the trigger will cause the hammer to be discharged or fall forward."

22

In response to the prosecutor's request that Keil demonstrate for the jury how one could pull back on the slide to shoot the gun, Keil testified, "[A]fter [the magazine is] loaded and inserted, the operator would then pull the . . . slide to the rear and release it, and what this . . . movement does [is to cause] that first live round to be pushed up inside the magazine a little bit, and part of the slide mechanism actually pushes on the back of it and pushes it into the chamber, and what this accomplishes is even if this hammer were in a forward position when they started, it's now cocked and held to the rear, so now I can simply, provided the safety is off, apply pressure to the trigger and discharge it."

Keil test-fired the Titan pistol to see what the "natural sweep position would be of [the] safety mechanism" before he shot it. He did so to "educate myself on how this safety mechanism operates. I put it in a cocked condition. I rotated that lever so that the knurled part is facing the front of the firearm which is in a safe position, I can see the letter S for 'safe,' verified that . . . by pushing the trigger [I could not fire it]. . . . And I tried sweeping the hammer down with my thumb, sweeping it down to see how fast I could disengage [the safety], and when I did that, I noted what position it went in. [¶] So with the natural movement of my thumb as I sweep it down, if I simply sweep my thumb down starting with . . . my thumb on top of the knurled lever, sweeping it and pulling it all the way down towards the grip, it frequently goes to a four- or five o'clock position, meaning that I can then pull the trigger."

### b)      Bailiff's Demonstration

During deliberations, the jury requested a reading of defendant's testimony about how the gun discharged, an opportunity to view the gun, and a demonstration of the gun's "safety, hammer, & trigger." In response to those requests, the following exchange occurred between and among the trial court and counsel: "[Trial court]: We are outside the presence of the jury. . . . The defendant is not present. [Defendant's counsel], what are your thoughts on whether [defendant] has to be here? [¶] [Defendant's counsel]: I traditionally, your honor, waive my client's appearance, particularly when they're out of custody. I spoke with her this morning. I just texted earlier and told her that the jury

23

wanted to read some of the transcript regarding her testimony about the gun and her description during direct examination and she said she'd rather not be here for that and it was okay if I represented her interest. [¶] [Trial court]: So you're waiving her appearance? [¶] [Defendant's counsel]: Yes, Your Honor. [¶] [Trial court]: That's agreeable to the court."

Regarding the jury's request for a demonstration of the operation of the gun, the following exchange occurred outside the presence of the jury: "[Trial court]: The other thing we have to discuss is the second note ask[ing] for viewing of the gun and demonstration of safety, hammer[,] and trigger. [¶] To me this is a significant issue. I don't know how you want to handle it. The Bailiff is prepared to show the jurors the gun and to demonstrate the use of the safety and the hammer and the trigger if that is acceptable. I don't know what else we can do. I'm seeking some advi[c]e here. How would counsel want to proceed in response to this request to [view] the gun and to demonstrate the safety[,] hammer[,] and the trigger. [¶] [Prosecutor]: I'm in agreement with the trial court's suggestion. [¶] [Defendant's Counsel]: I don't think you can do it any other way, your Honor. The Bailiff obviously will be instructed not to answer any questions or any inquiries. [¶] [Trial court]: Well, let's do it in open court. Just have him . . . do it. In fact, . . . I'll take him through it and say, okay, show the jurors where the safety is and he can show them where the safety is. And I will ask him, how . . . do you fire the gun and have him do the slide and pull the trigger and pull the hammer back. Are we okay with that? [¶] [Prosecutor]: I'm fine with that. [¶] [Trial court]: The other option is to give the jurors the gun, and we just don't do that as a rule. . . ."

Then the following occurred in the presence of the jury: "[Trial court]: Good morning everyone. We are with the jury and we're going to be responding to the jurors' inquiry. We have two notes from the jury. First of all, I'm going to explain that [defendant] has waived her appearance for this response to your questions. We have questions. I want to take up the question regarding testimony second. Let's deal with the first question which is you have asked to view the gun and you've asked for a demonstration of the safety, hammer[,] and trigger. And so the Bailiff has the gun and

24

he's going to walk over in front of you and he'll show you where the safety is. [¶] [Bailiff]: Safety is right here (indicating). [¶] [Trial court]: [Bailiff], can you show the safety to the on position and off position. [¶] [Bailiff]: Right now the safety is on safe. Safe means that the lever is moved forward. To fire the weapon, I'll rotate lever backwards and there will be a little 'F' there. It's ready to fire. [¶] Juror No. 3: If you were to fire the gun and you've never used it before, I'm looking at like time wise, how much time does it take you to release the safety, pull back the hammer or the slide or whatever it is and fire? Does it take you a second? . . . [¶] [Bailiff]: You can do it if you . . . are proficient with the weapon, you can do it in a second. [¶] Juror No. 3: Okay. Do the hammer. [¶] Juror No. 11: Do it again. [¶] [Bailiff]: Right now it's on safe. Okay, if I pull it back. – [¶] Juror No. 10: Is that the only way to do the hammer? [¶] [Bailiff]: Another way to do the hammer is this way. [¶] Juror No. 3: So if that gentleman there—can you grab the gun from the front please. [¶] [Trial court]: We're getting way far afield. [¶] Juror No. 11: Repeat that so we can see what it takes to fire. [¶] [Bailiff]: Right now it's on safe. I can't fire. It's not cocked back. Now, if I want to fire it – [¶] [Trial court]: What if you cocked the hammer? [¶] [Bailiff]: Cocked the hammer. [¶] Juror No. 11: It's on safe. [¶] [Bailiff]: It's on safe. I can't fire it if it's on safe. [¶] Juror No. 6: So unsafe it and then shoot. [¶] [Bailiff]: Unsafe it. [¶] Juror No. 8: The slide is already pulled. [¶] [Bailiff]: I have to put a round in the chamber first to fire. If there was a magazine in here. Right now it's on safe, I can't fire. If I wanted to fire – [¶] Juror No. 3: Can you push the safety back at 6:00. [¶] [Bailiff]: It will still fire. [¶] Juror No. 3: At 5:00 or 6:00? [¶] [Bailiff]: It's at 6:00 right now. [¶] Juror No. 3: It went off at 6:00. Okay. [¶] [Bailiff]: At 5:00 it won't. [¶] Juror No. 10: What's 7:00? [¶] [Bailiff]: Oh, I'm looking at it this way. It's at 6:00. [¶] Juror No. 3: At 6:00. [¶] [Bailiff]: I can't fire this. You move it a little bit more at 6:00, it'll fire at 6:00. [¶] Alternate Juror No. 1: You said it will or won't fire? [¶] [Bailiff]: It will fire at 6:00. [¶] Alternate Juror No. 1: When you swing the lever, does it click? [¶] [Bailiff]: No, the lever does not click when I swing it. [¶] Alternate Juror No. 1: So what's the mechanism between disabling and abling a gun? [¶] [Bailiff]: I know how it

25

is internal.  [¶]  Juror No. 11:  But you have to pull the back down or rack?  [¶]  [Bailiff]: Yeah, I would have to rack it to pull the hammer back.  So right now it's ready to fire, but it's on safe.  The only way I can fire it, if I pull the lever back from 5:00—from safety to fire and then I can fire the weapon.  [¶]  Juror No. 10:  Can you do it with your thumb instead of the racking?  [¶]  [Bailiff]:  What do you mean?  [¶]  Juror No. 10:  The handle, cock?  [¶]  [Bailiff]:  Oh, yes.  [¶]  Juror No. 9:  Can you reach the safety with your thumb?  [¶]  [Bailiff]:  Well, I could.  [¶]  Juror No. 9:  You're an expert.  [¶]  Juror No. 3:  And on the slide, do you have to pinch the sides or can you pull it from the top?  Does the top slide?  [¶]  [Bailiff]:  This top?  [¶]  Juror No. 3:  Yeah, right there.  See, the— [¶] [Bailiff]:  This part, you have to pinch it on both sides.  Okay.  That's why you have the little grooves, so you can get a hold of it to slide it back.  That's one way.  [¶]  [Trial court]:  Look, I'm getting uncomfortable.  I think we've done enough.  If you have additional questions, we'll try to answer them."

> ### 3.    *Analysis*

The trial court erred in depriving defendant of her statutory and constitutional rights to be present during the bailiff's demonstration.  As explained above, defendant had a right to be present at each critical stage of the trial, and because it amounted to the jury's receipt of evidence, the bailiff's demonstration constituted a critical stage of defendant's trial.

"In all cases in which a felony is charged, the accused shall be present . . . during those portions of the trial when evidence is taken before the trier of fact . . . ."  (§ 977, subd. (b)(1).)  "'Evidence' means testimony . . . or other things presented to the senses that are offered to prove the existence or nonexistence of a fact."  (Evid. Code, § 130.)  "Every witness before testifying shall take an oath or make an affirmation or declaration in the form provided by law . . . ."  (Evid. Code, § 710.)  Evidence Code section 165 states, "'Oath' includes affirmation or declaration under penalty of perjury."

26

Without defendant present, the bailiff spoke extensively[2] to the jury about, and demonstrated for the jury, the operation of the gun's safety and hammer, including their effect on the gun's ability to fire, the time it takes to release the gun's safety, and the "racking" of the gun to ready it for firing—pulling back on the slide thereby cocking the hammer. The bailiff responded to a number of questions posed by the jurors, and one of the juror's at that time expressly characterized the bailiff as "an expert."

Although the bailiff was not a sworn witness, his "demonstration" essentially amounted to testimony. Even if the bailiff's remarks were not testimony, they resulted, in effect, in the jury's receipt of evidence. (*People v. Bolin* (1998) 18 Cal.4th 297, 325 ["Although a jury view is not among the designated proceedings in section 977, we have long held that 'in so viewing the premises the jury was receiving evidence' even if nontestimonial"].) Therefore, the trial court erred by allowing the bailiff to demonstrate to the jury the operation of the gun, including answering the juror's questions, without defendant being present because the demonstration was a critical stage of the trial proceedings.

The Attorney General argues that there was no error because defense counsel waived defendant's presence. There was, however, no valid waiver of defendant's statutory right to be present during the bailiff's demonstration. As noted, section 977, subdivision (b)(1) required defendant "to be present . . . during those portions of the trial where evidence is taken before the trier of fact . . . ." A written waiver executed by a defendant is required for a defendant to waive his or her presence at such a hearing. (§ 977, subd. (b)(2).) Defendant did not execute a written waiver of her right to be present at the bailiff's demonstration, and, therefore, there was not a valid waiver under section 977.

Even if defendant's counsel could waive defendant's constitutional and statutory rights to be present at the bailiff's demonstration, there was no valid waiver. In *Larson v. Tansy* (10th Cir. 1990) 911 F.2d 392, the defendant was found guilty of criminal sexual

---

[2]     The bailiff's demonstration to the jury is recorded in approximately three and one-half pages of the reporter's transcript.

27

penetration and sentenced to life imprisonment. During trial, the defendant spent much of the time with his head on counsel table and never talked to his trial counsel. At the conclusion of all testimony, the trial court told the defendant's counsel that the defendant could leave the courtroom if counsel would waive his presence. Defense counsel agreed, the defendant was escorted back to the psychiatric hospital to which he had been admitted, and defense counsel represented that the defendant was voluntarily absenting himself from the proceedings. The defendant was absent for the remainder of his trial, including the jury instruction conference, jury instructions, closing arguments, and the rendering of the verdict. (*Id.* at p. 393.)

The court in *Larson v. Tansy, supra,* 911 F.2d at page 394 said "that defendant had a constitutional right to be present at the jury instructions, the closing statements, and the rendering of the verdict." In holding that there was not a valid waiver of the defendant's right to be present at those proceedings, the court stated, "The record indicates defendant's counsel, and not defendant, waived defendant's right of presence at trial. The trial court never directly addressed defendant concerning his counsel's request to conduct the remainder of the trial in defendant's absence. We hold that defendant did not waive his right to be present. [¶] Several circuits have held that defense counsel cannot waive a defendant's right of presence at trial. [Citations.]" (*Id.* at p. 396.) The court added, "[T]wo circuits that have allowed a defendant's counsel to waive his client's right of presence both involve counsel that at least communicated with their clients the need or possibility for attendance at trial. *Wilson v. Harris*, 595 F.2d 101, 104 (2d Cir. 1979); *United States v. Dunlap*, 595 F.2d 101, 868 (4th Cir.), cert. denied, 439 U.S. 858, 58 L.Ed. 2d 166, 99 S. Ct. 174 (1978). No such communication took place in this case. Even if defense counsel could have validly waived defendant's right to be present for the conclusion of his trial, where defense counsel did not consult with defendant concerning the waiver and did not obtain defendant's consent, the waiver will not be binding on defendant. [Citations.]" (*Id.* at p. 396, fn. 2.)

In *People v. Davis, supra,* 36 Cal.4th 510, our Supreme Court stated, "It does not appear that we have addressed the question whether defense counsel may waive the

28

defendant's presence. Some federal cases that have addressed this issue have held that defense counsel may do so, but only if there is evidence that the defendant consented to the waiver. (E.g., *Carter v. Sowders* (6th Cir. 1993) 5 F.3d 975, 981-982; *Larson v. Tansy*[, *supra*,] 911 F.2d [at pp.] 396-397; but see *United States v. Gordon* (D.C. Cir. 1987) 264 U.S. App. D.C. 334, 829 F.2d 119, 125-126 [personal on-the-record waiver of presence right required].) At a minimum, there must be some evidence that the defendant understood the right he was waiving and the consequences of doing so. (See *United States v. Nichols* (2d Cir. 1995) 56 F.3d 403, 416-417.) [¶] Here, there is scant evidence of consent, and even less evidence that defendant understood the right he was waiving and the consequences of his waiver. All the record shows is that defense counsel represented to the court that counsel had discussed the hearing with defendant and that defendant would waive his presence. There is no evidence that defense counsel informed defendant of his right to attend the hearing; nor is there evidence that defendant understood that by absenting himself from the hearing he would be unable to contribute to the discussion . . . . Accordingly, we cannot conclude that defendant knowingly and intelligently waived his right to presence at the hearing." (*Id*. at p. 532, fn. omitted.)

Here, defendant's counsel purportedly waived defendant's presence, but the record reflects only that defendant's counsel advised defendant that the jury wanted a transcript of some of defendant's testimony and, on that basis, she orally agreed with defendant's counsel to waive her presence. There is nothing in the record showing that defendant knew about the proposed demonstration or that the bailiff would answer questions from the jurors. Based on the record, the oral waiver of defendant's presence by defendant's counsel, at most, related only to the jury's request for a transcript of some of defendant's testimony. Thus, defendant did not waive her constitutional rights to be present at the bailiff's demonstration.

The trial court's error in connection with the bailiff's demonstration in defendant's absence does not require a reversal because it was harmless beyond a reasonable doubt. (*People v. Martinez* (2009) 47 Cal.4th 399, 424.) The bailiff's demonstration, which included answering the jurors' questions, although improper, was in substance materially

29

the same as Keil's testimony.[3]  Keil, like the bailiff, demonstrated for the jury, and spoke to the jury about, the weapon's operation including, inter alia, the location, use, and effect of the gun's safety, hammer, and slide.  In addition to being similar to the bailiff's demonstration, Keil's testimony concerning the operation of the gun was substantially more extensive than that demonstration.  Defendant was present during Keil's testimony, and her counsel cross-examined him.  Any issues defendant had concerning the accuracy, characterization, or relevance of Keil's testimony could have been raised by objection during Keil's testimony on direct examination, or by defendant's counsel during his cross-examination of Keil.

In addition, defendant testified about her extensive knowledge of firearms, but she did not testify about Keil's testimony or otherwise challenge the manner in which he characterized the operation of the gun.  Also, defendant did not offer the testimony of an expert witness to contradict Keil's testimony concerning the operation of the gun, or explain how the gun could discharge accidentally if, as defendant testified, she "squeezed" the gun or held it "tightly" and did not "try to pull the trigger."  Moreover, defendant's firearms and trajectory reconstruction expert did not disagree with Keil's testimony concerning the operation of the gun.

Defendant contends that, in a response to one juror's question, the bailiff stated during his demonstration that if a shooter was proficient with the weapon, he or she could release the safety, pull back the hammer or the slide, and fire the gun "in a second." Defendant argues that she was prejudiced by her improper absence during the bailiff's demonstration because Keil did not testify about the time it takes to perform those tasks, and she did not have an opportunity to address the subject.

With respect to the time it takes to perform one of the two steps described by the bailiff—disengaging the safety—Keil testified that in performing a test on the gun, "I tried sweeping the hammer with my thumb, sweeping it down to see how fast I could disengage [the safety]. . . .  [¶]  So with the natural movement of my thumb as I sweep it

---

**3**     In the attached appendix, we set forth a comparison of relevant portions of Keil's testimony and the bailiff's description of his demonstration.

down, if I *simply* sweep my thumb down starting with . . . my thumb on top of the knurled lever, sweeping it and pulling it all the way down towards the grip, it frequently goes to a four- or five o'clock position, meaning that I can then pull the trigger." (Italics added.) This testimony suggested that a person proficient in the use of handguns, such as defendant, who "simply" swept his or her finger in the manner described by Keil could ready the gun to fire quickly. Thus, defendant could have cross-examined Keil on the issue of how quickly the gun could have been readied to fire. In addition, defendant testified that she did not know whether the gun had the safety on or whether "the hammer was cocked" when she picked up the gun and shot Lemons. Based on that testimony, there was no way to know if, just before defendant shot Lemons, the safety was engaged and the hammer was not cocked (by pulling back the hammer or the slide). Therefore, anything the bailiff said concerning how fast a gun could be readied to fire was of no consequence.

Defendant next contends that the error was prejudicial because, unlike the bailiff, Keil testified that "if the gun were cocked and the safety on, the safety could accidentally disengage and the gun could fire by putting pressure on the trigger." Defendant argues that had she been present, she "could have pointed out that the bailiff's demonstration failed to represent accurately how she maneuvered the gun." The challenged portion of Keil's testimony, however, concerned whether it was advisable to carry a gun in a person's pocket, and there was no testimony in the record that the gun was in defendant's pocket immediately before she shot Lemons. In addition, as noted above, defendant testified that she did not know whether the gun's safety was on or whether "the hammer was cocked" when she picked up the gun.

Further, the prosecution's forensic evidence rebutted defendant's contention that she squeezed the gun tightly and it fired accidentally. That evidence showed that Lemons's wound was caused by a shot from a gun that was placed on or very near Lemons's head, and at the time Lemons was shot he was seated in the car and defendant was standing near the passenger door frame. The evidence also reflected that for the gun to fire, over seven pounds of force had to be applied to the trigger. Thus, Keil's

31

testimony covered the substance of the bailiff's demonstration and was more extensive. The demonstration during defendant's absence from the courtroom was therefore harmless beyond a reasonable doubt. (*People v. Martinez*, *supra*, 47 Cal.4th at p. 424; *Chapman v. California, supra,* 386 U.S. at pages 22, 24**.)**

In addition, defendant's counsel acceded to the bailiff's demonstration in defendant's absence. Although defense counsel conditioned his agreement to allow the demonstration on the basis that the bailiff not answer questions, once the bailiff began to answer jurors' questions, defense counsel did not object. Thus, there was a forfeiture of any claim of error with respect to the bailiff's conduct, apart from the issue of defendant's absence. (*People v. Cunningham* (2001) 25 Cal.4th 926, 989.)

## C. Character Evidence

Defendant contends that the trial court erred in admitting evidence of defendant's character and prior bad acts. We disagree.

### 1. Standard of Review

We review a trial court's evidentiary rulings for abuse of discretion. (*People v. Jablonski* (2006) 37 Cal.4th 774, 805; *People v. Harris* (2005) 37 Cal.4th 310, 335; *People v. Alvarez* (1996) 14 Cal.4th 155, 201.) "'"[A] trial court's ruling will not be disturbed, and reversal . . . is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice."'" (*People v. Foster* (2010) 50 Cal.4th 1301, 1328-1329.)

### 2. Background

Prior to trial, the prosecutor filed a motion pursuant to Evidence Code sections 1101, and 1109 for leave to present evidence of defendant's prior incidents of domestic violence against her husband, Lemons, and past boyfriends, and other bad acts. Defendant opposed the motion.

At the hearing on the motion, the trial court ruled that the prior incidents involving defendant's acts of domestic violence against Lemons were admissible under Evidence Code sections 1109 and 1101, subsection (b) to show intent and absence of mistake. As to the prior incidents involving defendant's acts of domestic violence against men with whom she had a past dating relationship, the trial court found that it would be in the interest of justice to admit the evidence, and ruled such evidence admissible under Evidence Code sections 1109 and section 1101, subsection (b) to show absence of mistake. The trial court also ruled that evidence of the other bad acts was inadmissible in the case-in-chief pursuant to Evidence Code section 352, but that such evidence could be admissible during cross-examination if defendant chose to testify.

### 3.     *Analysis*

Evidence Code section 1101, subdivision (a) provides that, as a general rule, character evidence is inadmissible to prove a person's conduct on a specific occasion. Evidence that a defendant committed a prior crime or other bad act may, however, be admissible "when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than his or her disposition to commit such an act." (Evid. Code, § 1101, subd. (b).)

In cases involving domestic violence, the Legislature has also created another specific exception to the general rule that evidence of prior bad acts is inadmissible to prove a defendant's propensity to commit the charged offense. (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1159; *People v. Reyes* (2008) 160 Cal.App.4th 246, 251.) Evidence Code section 1109, subdivision (a)(1) states, "Except as provided in subdivision (e) . . . , in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible

33

pursuant to Section 352.[4]  [¶] . . . [¶]  (d) As used in this section: . . . .  [¶] . . .  [¶]  (3) 'Domestic violence' has the meaning set forth in [s]ection 13700 . . . .  [¶]  (e)  Evidence of acts occurring more than 10 years before the charged offense is inadmissible under this section, unless the court determines that the admission of this evidence is in the interest of justice."  One means by which the "interest of justice" exception is met is "where the trial court engages in a balancing of factors for and against admission under [Evidence Code] section 352 and concludes . . . that the evidence was 'more probative than prejudicial.'" (*People v. Johnson, supra,* 185 Cal.App.4th at pp. 539-540.)  Evidence Code section 352 grants the trial court discretion to exclude evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

Section 13700, subdivision (b), defines domestic violence as "abuse committed against an adult or a minor who is a spouse, former spouse, cohabitant, former cohabitant, or person with whom the suspect has had a child or is having or has had a dating or engagement relationship."  "'Abuse' means intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another." (§ 13700, subd. (a).)

Defendant does not specify the prior conduct evidence she challenges on appeal, merely contending that "the prosecution presented several witnesses who testified about [defendant's] other 'bad acts' . . . ."  Defendant, however, refers to, "for example," testimony concerning several matters.  We therefore limit our discussion to the testimony referred to by defendant in her appellate briefs.  (*Alvarez v. Jacmar Pacific Pizza Corp.* (2002) 100 Cal.App.4th 1190, 1206, fn. 11 ["It is not our responsibility to develop an appellant's argument"]; *Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106 ["An appellate court is not required to examine undeveloped claims, nor to make

---

**4**     "[E]vidence of past domestic violence is presumptively admissible under [Evidence Code section 1109,] subdivision (a)(1) . . . ." (*People v. Johnson* (2010) 185 Cal.App.4th 520, 537.)

34

arguments for parties"].)  We also note that, "'[w]e are required to uphold the [trial court's] ruling if it is correct on any basis, regardless of whether it is the ground relied upon by the trial judge.  [Citation.]'" (*In re Marriage of Carlson* (1991) 229 Cal.App.3d 1330, 1337, overruled on other grounds in *In re Marriage of Burgess* (1996) 13 Cal.4th 25, 37-38, fn. 9.)

Contending "by example" that such evidence of prior acts was improperly admitted, defendant refers to White's testimony that he "heard a gunshot and then saw Lemons run in the house laughing."  This testimony was admissible under Evidence Code section 1101, subdivision (b) as relevant to prove absence of mistake or accident.  White testified that immediately before he heard the gunshot, defendant was angry at Lemons, and when Lemons ran in the house laughing, Lemons said, "Man, this girl is crazy.  She just shot a gun up in the air."  It was reasonable to infer from this evidence that, as to the past incident in question, the gun did not discharge accidentally; defendant intentionally shot the gun in the air.  Because defendant fired a weapon during a previous altercation with Lemons, and because there was evidence that she and Lemons were engaged in a physical altercation at the time she shot Lemons, a reasonable juror could have inferred the shooting of Lemons was not accidental.

Defendant also refers to Stillwell's testimony "that [defendant] shot a gun against a freeway embankment."  This testimony was admissible under Evidence Code section 1101, subdivision (b) as relevant to prove absence of mistake or accident.  Stillwell testified that at the time of that shooting, defendant was upset because a homeless woman was in the back of defendant's property, and defendant shot the gun against the freeway embankment as the homeless woman was walking away from the property.  After defendant shot the gun, Stillwell said to Lemons, "Man, your wife is crazy."  It was reasonable to conclude from this evidence that, as to the prior incident in question, the gun did not discharge accidentally; defendant intentionally shot the gun against the freeway embankment.  Because a reasonable juror could have inferred from that past conduct that the shooting of Lemons was not an accident or a mistake, it was not an abuse of discretion to admit it.

35

Defendant refers, as another example of improper testimony, to the testimony that "Collier and Tripp heard [defendant] say she always carried a gun. Collier heard defendant say Lemons 'pissed her off' and that she could 'sometimes . . . just kill him.'" This testimony is admissible under Evidence Code section 1101, subdivision (b) as relevant to prove motive, intent, and absence of mistake or accident. It was evidence that defendant always had a gun with her, and that she expressed she has been angry enough at Lemons in the past to kill him.

Defendant also refers to Newman's testimony "about how [defendant] complained about Lemons [*sic*] failure to make money, about her wedding ring and about Lemons's friends." This testimony was admissible under Evidence Code section 1101, subdivision (b) as relevant to prove motive, intent, and absence of mistake or accident. Because a reasonable juror could conclude from this evidence that defendant's dissatisfaction with Lemons's financial status was a factor in her motive and intent to kill Lemons, and her killing Lemons was not an accident, it was not an abuse of discretion to admit it.

In addition, defendant refers to the testimony that "White, Collier, Newman and Tripp heard arguments between [defendant] and Lemons." This testimony was admissible under Evidence Code section 1101, subdivision (b) as relevant to prove motive, intent, and absence of mistake or accident. The testimony is also admissible under Evidence Code section 1109.

White, Collier, Newman, and Tripp testified that defendant committed hostile acts against Lemons during arguments. White, in essence, testified that during an argument between defendant and Lemons, defendant intentionally shot a gun in the air. Collier testified that during an argument between defendant and Lemons, she heard a slap, and that defendant threw a bag at Lemons and placed her hands on Lemons's face. Collier testified that she had seen several arguments between defendant and Lemons, and defendant "was the aggressor" during each of them. Newman testified that defendant angrily grabbed Lemons's shirt during an argument. Tripp testified that he was in a hotel room adjacent to the room of defendant and Lemons during one of the argument and heard a tap on the wall. Lemons said to defendant, "You threw an iron at me," and "Get

36

off me." The morning following the argument, Trip saw that Lemons had three long scratches on his neck consistent with fingernail scratches. It would have been reasonable for a trier of fact to conclude from this evidence that defendant "intentionally or recklessly caus[ed] or attempt[ed] to cause [Lemons] bodily injury" when they argued. Again, it was not an abuse of discretion for the trial court to conclude that this evidence was relevant to prove motive, intent, and absence of mistake or accident.

Defendant also refers to the following testimony as other examples of improperly admitted evidence: "Jones testified how [defendant] got angry when she found out he was cheating on her. [Defendant] put a burned 'shooting shirt' on his car. . . . Hall, a roommate of someone [defendant] dated in college, testified about how [defendant] threatened to have someone shoot up their house. The next day, several car windows were smashed." As the trial court correctly concluded, this testimony was admissible under Evidence Code section 1109. Jones and Hall were in a dating relationship with defendant at the time the prior incidents with defendant occurred. Therefore the incidents qualified as domestic violence under Evidence Code section 1109. (§ 13700, subd. (b).) Evidence Code section 1109, subdivision (a) provides that evidence of defendant's commission of other domestic violence is not made inadmissible by Evidence Code section 1101 if the evidence is not inadmissible pursuant to Evidence Code section 352. Defendant's act of threatening to have someone "shoot up" a person's house, smashing vehicle's windows, and placing a burned basketball shirt on a person's vehicle were hostile acts directed at a person who was romantically involved with defendant. Jones testified that defendant seemed aggressive, and Hall testified that he took defendant's threat seriously. It was reasonable for the trial court to conclude that defendant's acts placed Jones and Hall in reasonable apprehension of imminent serious bodily injury to themselves or others. (§ 13700, subd. (a).)

That testimony was also admissible under Evidence Code section 1101, subsection (b) to show absence of mistake. There was evidence that the referenced hostile acts were not accidental, and therefore it reasonably suggested that defendant did not shoot Lemons accidentally.

Defendant contends that even if the evidence had some probative value, it should have been excluded under Evidence Code section 352 because the introduction of the evidence consumed a "disproportionate amount of trial time." We disagree.

The probative value of the evidence, as discussed *ante*, was significant, and was not "substantially outweighed" by amount of time it took to present it. Defendant's motive, intent, and absence of mistake or accident in killing Lemons were essential issues at trial because no one other than defendant witnessed the shooting.

Even if the trial court erred in ruling on the admissibility of the evidence, the error was harmless under either *Chapman v. California, supra,* 386 U.S. at pages 22 and 24 or *People v. Watson* (1986) 46 Cal.2d 818, at page 836. As discussed above, the forensic evidence showed that defendant intentionally killed her husband with a contact shot to his head. It showed that Lemons's gunshot wound was a contact wound—a wound caused by a gun placed on or very near his head. At the time Lemons was shot he was seated in the car and the defendant was standing near the door frame, and for the gun to fire, over seven pounds of force on the trigger was required. The testimony from Wright and Young also established that defendant attacked Lemons with closed fists just before the shooting. In addition, defendant did not provide any evidence explaining how the gun could accidentally discharge by squeezing it.

### D. Admission of the Testimony of Wright and Young

Defendant contends that the trial court erred in admitting the testimony of Wright and Young because they did not identify defendant or the victim and therefore their testimony was irrelevant and would confuse the jury. Defendant also contends that she received ineffective assistance of counsel because her trial counsel failed to object to their testimony.

Only relevant evidence is admissible. (Evid. Code, §§ 350, 351.) "'Relevant evidence' means evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)

38

Evidence Code section 352 allows a trial court to exclude evidence if its probative value is substantially outweighed by the probability that its admission will create a substantial danger of undue prejudice. (Evid. Code, § 352; *People v. Callahan* (1999) 74 Cal.App.4th 356, 367.) "Under Evidence Code section 352, the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time. . . . [I]ts exercise of that discretion 'must not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]' [Citation.]" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125.)

Defendant concedes that her trial counsel failed to object to the Wright and Young's testimony regarding what they witnessed on the evening of the murder. Defendant therefore has forfeited any challenge on appeal to the admission of their testimony. (*People v. Cunningham, supra,* 25 Cal.4th at p. 989.)

Defendant claims that her counsel's failure to object to the introduction of the evidence resulted from ineffective assistance of counsel. To prevail on an ineffective assistance of counsel claim, defendant must show that the conduct of her trial counsel about which she complains fell below the standard of reasonableness and that she was prejudiced by that conduct. (*People v. Kraft* (2000) 23 Cal.4th 978, 1068-1069; *People v. Foster* (2003) 111 Cal.App.4th 379, 383.)

Despite a claim of ineffective assistance of counsel, if "the record does not show the reason for counsel's challenged actions or omissions, the conviction must be affirmed unless there could be no satisfactory explanation. [Citation.]" (*People v. Anderson* (2001) 25 Cal.4th 543, 569.) "[T]he appellate record rarely demonstrates 'that the failure to object was the result of counsel's incompetence; generally, such claims are more appropriately litigated on habeas corpus, which allows for an evidentiary hearing where the reasons for defense counsel's actions or omissions can be explored.' [Citations.]" (*People v. Salcido* (2008) 44 Cal.4th 93, 152.) "[D]eciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance.

[Citation.]" (*People v. Hillhouse* (2002) 27 Cal.4th 469, 502.) Because the record in this case does not show the reason for trail counsel's failure to object, the matter would be more appropriately litigated on habeas corpus. We therefore need not decide the issue.

Even if we were to decide whether defendant received ineffective assistance of counsel, defendant has not established that she suffered such assistance because the conduct of her trial counsel did not fall below the standard of reasonableness. The challenged testimony was probative and not inadmissible under Evidence Code section 352, such that any objection under Evidence Code section 352, or otherwise, would have been futile. Although neither Wright nor Young identified defendant and Lemons as the couple they observed fighting, the jury could draw a reasonable inference from the evidence that defendant and Lemons were the couple that Wright and Young saw. Wright and Young testified that the male and female they saw were African-American, and the man wore a baseball cap. Wright testified that woman had "pressed" bobbed hair that extended below her ears. That description matched the image of defendant and Lemons captured on the TGIF video recording. Wright and Young testified as to what they observed on the evening of the murder near Central Avenue and the 91 Freeway, a location near where defendant testified the shooting occurred. They witnessed the events at about the same time defendant and Lemons left TGIF. Wright and Young identified the vehicle that they saw as silver or grey in color. White testified that defendant had a silver BMW, and Deputy Brown testified that he found Lemons's deceased body inside defendant's BMW. Wright and Young both testified that the man they saw wore a baseball cap. Detective Rubino testified that after the shooting, he found a baseball cap on the passenger seat floorboard of the vehicle. It was reasonable for a trier of fact to conclude from this evidence that Wright and Young witnessed the incident moments before and after defendant shot Lemons.

40

### E. Jury Instruction

Defendant contends claims that she received ineffective assistance of counsel when her trial counsel failed to request a voluntary intoxication instruction.[5] We disagree.

The failure of defendant's counsel to request a voluntary intoxication instruction did not fall below an objective standard of reasonableness. "'[A] defendant is entitled to [a voluntary intoxication instruction] only when there is substantial evidence of the defendant's voluntary intoxication and the intoxication affected the defendant's "actual formation of specific intent."' [Citations.]" (*People v. Verdugo* (2010) 50 Cal.4th 263, 295; *People v. Williams* (1997) 16 Cal.4th 635, 677 [concluding that the trial court did not err in refusing defendant's requested instruction on voluntary intoxication because there was no evidence that voluntary intoxication had any effect on defendant's ability to formulate intent].) "Substantial evidence is evidence of ponderable legal significance, reasonable in nature, credible, and of solid value. [Citation.]" (*Ermoian v. Desert Hospital* (2007) 152 Cal.App.4th 475, 501.) "'Substantial evidence is evidence sufficient to "deserve consideration by the jury," that is, evidence that a reasonable jury could find persuasive.' [Citation.]" (*People v. Lewis* (2001) 25 Cal.4th 610, 645.)

There was evidence of the defendant's drinking. There was not, however, substantial evidence to allow a reasonable juror to conclude that defendant's consumption of alcohol affected her formation of specific intent. (*People v. Verdugo*, *supra*, 50 Cal.4th at p. 295; *People v. Williams*, *supra*, 16 Cal.4th at p. 677.) Defendant was able to

---

[5]     CALCRIM 625 provides, "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with an intent to kill[,] [or] [the defendant acted with deliberation and premeditation[,]] [[or] the defendant was unconscious when (he/she) acted[,]] [or the defendant _____ <insert other specific intent required in a homicide charge or other charged offense> .] [¶] A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect. [¶] You may not consider evidence of voluntary intoxication for any other purpose."

pay the TGIF bill, take the car keys from Lemons, and drive the car herself. During cross-examination, defendant testified that despite consuming alcohol, she was not feeling "lightheaded," "buzzed," or "drunk," and that she "felt fine." In addition, because the record does not reflect the reason, if any, for defendant's counsel's failure to request the jury instruction, we cannot determine that there was ineffective assistance issue on appeal. (*People v. Salcido*, *supra*, 44 Cal.4th at p. 152; *People v. Anderson*, *supra*, 25 Cal.4th at p. 569.)

### F. Prosecutorial Misconduct

Defendant contends that the prosecutor committed misconduct by improperly vouching for the prosecution witnesses during the closing arguments. We disagree.

#### 1. Background

During her closing arguments, the prosecutor repeatedly used the term "we know" while describing the evidence at trial. The prosecutor stated, "How the weapon was used. In this case *we know* that the weapon was placed up against the head of the victim and the victim was shot at a contact shot. [¶] The nature of the wound. *We know*, again, that this is a contact shot. *We know* that it's a downward trajectory. [¶] And the type of attack. *We know* that this person was likely standing on the outside of the vehicle and the victim was in the vulnerable position of inside the car because that's how we can get all the evidence to be consistent with one another and make sense, and that's the point in time when he was shot." (Italics added.)

The prosecutor argued that she knew about defendant's disposition and what happened at the site of the shooting, as follows: "*We know* that other people have said that she gets angry at the victim. *We know* that she's been abusive towards the victim. *We know* that she didn't assist after this shot was done. *We know* that she drove off to her parents' house and *we know* she left the scene." (Italics added.)

The prosecutor in telling the jury that defendant had no fear of Lemons said, "Even after these other instances where she claimed she'd been abused, she still felt that

she was okay with him being around the gun. And *we know* from the weekend before there was an incident, according to her, where he was left with the gun. And despite all of that, she continued to carry the gun around. And on this particular occasion, she could not communicate what exactly it was that caused her to be fearful." (Italics added.)

When arguing against self-defense, the prosecutor stated, "And what *we know* from her abuse is that it's nothing like the kind of abuse that their hired doctor said that other women in these typical situations go through before they kill their husband. Her worst, worst incident was the one where she claimed that her neck was injured, which also happened to be an incident that *we know* didn't happen based on Felicia Tripp's testimony because she was right next door and the aggressor in that case was actually the defendant and the person who came out with injuries was actually the victim." (Italics added.)

Regarding the prior acts, the prosecutor argued, "Now, these acts—and I'm sorry, and finishing up with Derrick Stillwell, *we know* that he had seen the defendant get upset at a homeless person that was in the property. And even after the homeless person walked away, she made it a point to go to her gun, get the gun and shoot it at a freeway wall behind him—behind her. I'm sorry. [¶] What *we know* from these acts is that the defendant has in the past deliberately premeditated shootings, and she's done that with conscious disregard to the safety of the other people around. That she's committed violent acts without concern for the people who are around." (Italics added.)

When arguing about the forensic evidence, the prosecutor argued that, "And then you have to consider the forensic evidence. *We know* from all of the facts in this case that the position that the victim was in at the time he was shot was sitting in the front passenger seat of that car facing forward with his legs underneath the dash, and *we know* that because of the blood flow that was coming from the left side of his head. *We know* that because he would have died within seconds, but sometime before that happened he had vomited, and sometime before he had vomited his hat had fallen off in the car. And *we also know* that based on the G.S.R. evidence and where it was located and based on the casing evidence. [¶] And *we also know* that this happened this way because we have

43

witnesses who say that they saw someone who looked just like the victim, look [*sic*] just like the defendant, in a car that was described just like theirs [*sic*] having an altercation outside of the vehicle, and they saw the defendant striking, making strike movements towards the victim as he was backing up into that car. . . . [¶] *We know* that the victim sat down in that chair because that's the last position witnesses saw him in, and *we know* that the defendant then reached inside that vehicle and *we know* that the defendant shot the victim in the head. And the kind of shot that we have in this case is a contact shot, and *we know* it's a contact shot because of the evidence that the criminalist described and what was seen in the autopsy." (Italics added.)

The prosecution argued about the operation of the gun, saying, "And *we know* that this kind of crime took deliberation, it took premeditation because of the type of weapon that was used. *We know* that as a single-action gun, this gun has to either have the slide pulled back or has to have the hammer pulled back. It has to have the safety rotated from the 9:00 position to somewhere past the 6:00 position. *We know* that she had to place her finger on the trigger. *We know* she had to lift that gun up and place it up against his head, and *we know* that she had to fire that gun. All of those things took deliberation, they took thought, they took careful consideration. [¶] Now, *we don't know* when she pulled that gun out of the car." (Italics added.)

The prosecutor in discussing defendant's credibility and motive to kill Lemons argued, "And *we know* from her statements that she's anything but consistent. *We know* that she has the motive to lie over anyone else who came into court. [¶] . . . [¶] So *I could tell you* right now that the reason why person 'A' killed person 'B' is because person 'A' was sick of person 'B.' Person 'A' was fed up and tired of person 'B' and the fact that he just wasn't bringing in the money and how dare person 'B' embarrass person 'A' in front of everybody like that. But that's not good enough, right, to the rest of us. That just doesn't sound good enough. But that's why we don't have to prove motive in this case. This is a serious case and *we know* you're taking it seriously. *We know* that in the past things have happened to Marcus Lemons and to other people and they thought— the witnesses thought that this wasn't—nobody thought anything of it." (Italics added.)

44

When discussing defendant's inability to recall the events of February 21, 2009, the prosecutor argued, "Now, when person 'A' took the stand, person 'A' had selected amnesia. When there were questions that person 'A' couldn't answer, person 'A' didn't know the answer. Person 'A' claimed that she couldn't recall what happened to the purse. Well, *we know* that she also testified after she did some drawings, some art therapy, she was able to recall some events about that purse. After she had met with her attorney just a couple of weeks before trial, she was able to recall what happened to that purse. [¶] . . . [¶] Now, maybe, the expert said, if she'd been sophisticated, perhaps then she could get away with it. I don't know how much more sophistication we can have. A police officer who spent the last two years thinking about this trial, who *we know* based on notes from the other therapist had been reading up on domestic violence." (Italics added.)

In connection with why the CHP allowed defendant to continue to work after the incident, the prosecutor argued, "*We don't know why* the C.H.P. hired [defendant]. *We don't know* why the C.H.P. allowed [defendant] to come back to work. We don't have evidence as to why this case took two years to come to you." (Italics added.)

### 2. *Analysis*

Defendant forfeited her contention that the prosecutor committed misconduct by making improper closing arguments. "To preserve a claim of prosecutorial misconduct for appeal, a criminal defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the impropriety. [Citations.]" (*People v. Cole* (2004) 33 Cal.4th 1158, 1201; *People v. Ochoa* (1998) 19 Cal.4th 353, 427-428.)

Defendant concedes that her trial counsel failed to object or request a curative instruction to the allegedly improper closing arguments. Defendant argues that if we determine she forfeited her misconduct claim by her trial counsel's failure to object to the claimed misconduct, then she received ineffective assistance of counsel at trial requiring her conviction be reversed.

As stated above, claims of ineffective assistance of counsel are more appropriately litigated on habeas corpus, which allows for an evidentiary hearing of the reasons for defense counsel's actions or omissions. (*People v. Salcido*, *supra*, 44 Cal.4th at p. 152.) Deciding whether to object to the introduction of evidence is inherently tactical. (*People v. Hillhouse*, *supra,* 27 Cal.4th at p. 502.) Because the record sheds no light on the reasons, if any, for trial counsel's failures to object, we need not determine defendant's claim that there was ineffective assistance of counsel.

Even if we were to determine whether defendant received ineffective assistance of counsel, the failure of defendant's trial counsel to object during closing argument to the prosecutor's use of the phrase "we know" did not fall below an objective standard of reasonableness. A prosecutor may not vouch for the credibility of a witness. (*People v. Frye* (1998) 18 Cal.4th 894, 971, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) "However, so long as a prosecutor's assurances regarding the apparent honesty or reliability of prosecution witnesses are based on the 'facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief,' her comments cannot be characterized as improper vouching. [Citations.]" (*Ibid.*) The prosecutor's use of the phrase "we know" during closing argument does not constitute misconduct. "The standards under which we evaluate prosecutorial misconduct may be summarized as follows. A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales* (2001) 25 Cal.4th 34, 44.)

"At closing argument a party is entitled both to discuss the evidence and to comment on reasonable inferences that may be drawn therefrom. [Citations.]" (*People v. Morales*, *supra*, 25 Cal.4th at p. 44.) "'[T]he prosecutor has a wide-ranging right to discuss the case in closing argument. He has the right to fully state his views as to what

the evidence shows and to urge whatever conclusions he deems proper.' [Citation.]" (*People v. Panah* (2005) 35 Cal. 4th 395, 463.)

In *United States v. Younger* (9th Cir. 2005) 398 F.3d 1179, abrogated on another ground, as stated in *United States v. Vongxay* (9th Cir. 2010) 594 F.3d 1111, 1116, the prosecutors repeatedly used the phrase "we know" during closing argument in summarizing the facts of the case. The court found that the prosecutors' statements were not improper, stating, "We do not condone the prosecutors' use of 'we know' statements in closing argument, because the use of 'we know' readily blurs the line between improper vouching and legitimate summary. The question for the jury is not what a prosecutor believes to be true or what 'we know,' rather, the jury must decide what may be inferred from the evidence. We emphasize that prosecutors should not use 'we know' statements in closing argument. [¶] Nonetheless, the record in this case confirms that the prosecutors used the phrase 'we know' to marshal evidence actually admitted at trial and reasonable inferences from that evidence, not to vouch for witness veracity or suggest that evidence not produced would support a witness's statements. [Citation.] The prosecutors' statements thus were not improper. [Citations.]" (*United States v. Younger*, *supra*, 398 F.3d at p. 1191.)

In reviewing claims of misconduct during closing argument, we focus on how the statement would, or could, have been understood by a reasonable juror in the context of the entire argument. (*People v. Dennis* (1998) 17 Cal.4th 468, 522.) "'To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.'" (*People v. Gurule* (2002) 28 Cal.4th 557, 657, quoting *People v. Frye*, *supra*, 18 Cal.4th 894, 970.) "No misconduct exists if a juror would have taken the statement to state or imply nothing harmful." (*People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 839.)

The record presents no basis to infer that the jurors likely understood the prosecutor to be referencing facts not supported by the evidence, or to be asking them to find certain facts or disbelieve certain witnesses because of her personal integrity or

47

superior knowledge. A reasonable juror would have treated the prosecutor's comments as her argument to support the conclusion that the evidence established defendant was guilty of murdering Lemons. The prosecutor was advocating her theory of the case. The prosecutor marshaled the evidence, and did not attempt to vouch for any witness's veracity.

The trial court instructed the jury that it alone must determine the facts based only on the evidence that was presented at trial, and that nothing the attorneys said was evidence. We presume the jury followed the court's instructions. (*People v. Boyette* (2002) 29 Cal.4th 381, 436; *People v. Morales* (2001) 25 Cal.4th 34, 47 ["we presume that the jury relied on the instructions, not the arguments, in convicting defendant"]; *People v. Najera* (2006) 138 Cal.App.4th 212, 223-224 [when there is a conflict between counsel's argument and the court's instructions, courts presume the jury followed the instructions].) Defendant has made no showing the jury did not follow the trial court's instructions, and we conclude that there was no error in the prosecutor using the phrase "we know" is this case.

### G. Cumulative Error

Defendant contends that cumulative errors in this case require a reversal of her judgment of conviction. There has been no showing, however, of cumulative prejudicial error. (*People v. Watson* (2008) 43 Cal.4th 652, 704; *People v. Boyette, supra,* 29 Cal.4th at pp. 467-468; *People v. Seaton* (2001) 26 Cal.4th 598, 675, 691-692.) Having determined that there is merit in only one of defendant's contentions, but holding that error harmless, there is no occasion to consider the cumulative impact of errors.

## DISPOSITION

The judgment is affirmed.

**CERTIFIED FOR PARTIAL PUBLICATION**


MOSK, Acting P. J.

We concur:


KRIEGLER, J.


KUMAR, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

## APPENDIX

1. <u>SUBJECT</u>:  The Safety's on and off Positions.

| KEIL | THE BAILIFF |
|---|---|
| A. Keil testified that as depicted in a photograph, the firearm's safety was off, but "[i]f [the safety lever] was rotated 180 degrees to the front, it would be in a safe position." | A. "Right now the safety is on safe.  Safe means that the lever is moved forward.  To [disengage the safety], I'll rotate lever backwards and there will be a little 'F' there." |
| B. "The safety will be engaged from six o'clock or greater . . . ." | B. "Right now it's on safe." |
| C. If the safety is between "six o'clock and three o'clock" you will be able to fire the firearm. | C. The safety is on when the safety lever is in a "5:00" position. |
| D. "[If I move the safety lever] instead of an F [for 'fire], underneath the lever as it is right now you would see an S for 'safe.'" | D. The safety is off when the safety lever is in the "6:00" position. |
| E. "In this case the safety mechanism is on." | E. "[R]ight now it's ready to fire, but it's on safe." |

2. <u>SUBJECT</u>:  The Safety's Effect.

| KEIL | THE BAILIFF |
|---|---|
| A. As depicted in a photograph, the firearm is in a "ready to fire position." | A. When the safety is off, the gun "is ready to fire." |
| B. When the safety is engaged "you cannot pull the trigger . . . ." | B. "Right now it's on safe.  I can't fire [the gun]." |
| C. "If [the safety lever] is between six o'clock and three o'clock, you will be able to fire the firearm.  So it will discharge." | C. If the hammer is cocked and the safety is on, "I can't fire [the gun]." |
|  | D. "Right now it's on safe, I can't fire." |

| | |
|---|---|
| D. When the safety lever is moved to the "F" depicted on the gun, "the gun is ready to fire."<br><br>E. The gun "will discharge with the safety in the position as depicted."<br><br>F. "The operator would rotate [the safety lever] to the rear, at which point I could apply pressure to the trigger, and the hammer will discharge."<br><br>G. "[P]rovided the safety is off, [I can] apply pressure to the trigger and discharge [the gun]." | E. The gun "will still fire" when the safety is off—i.e., when the safety lever is in a 6:00 position.<br><br>F. The gun will not fire when the safety is on—i.e., when the safety lever is in a 5:00 position.<br><br>G. "You move [the safety lever] a little bit more at 6:00, it'll fire at 6:00."<br><br>H. "It will fire at 6:00."<br><br>I. "[I]f I pull the lever back from 5:00—from safety to fire[,] . . . then I can fire the weapon." |

3.  <u>SUBJECT</u>:  The Hammer.

| KEIL | THE BAILIFF |
|---|---|
| A. A graphic photograph of the firearm "depicts the hammer in the forward or uncocked position."<br><br>B. "[A] single-action mode of fire . . . means that the hammer must be in a cocked position before you attempt to fire it."<br><br>C. "[T]he operator can thumb [the hammer] back, meaning they pull it to the rear where it's held by the internal mechanisms of the firearm until the trigger is depressed . . . at which time the firearm will release the hammer [and the gun will fire]."<br><br>D. While the gun is firing, the slide | A. The bailiff's pulled the hammer in the direction of the rear of the gun.<br><br>B. The bailiff showed the jury "another way" to cock the hammer. |

| | |
|---|---|
| "recocks" the hammer. | |
| E. "At this point the [trigger] is in a cocked position because the slide has been to the rear." | |
| F. "The hammer will fall forward striking the firing mechanism" and ultimately the firing process "cock[s] the hammer." | |
| G. "It is a single-action, meaning that the hammer must be in a cocked position to fire.  If it is not, pulling the trigger accomplishes nothing.  It does not function. In a cocked position, putting . . . pressure on the trigger will cause the hammer to be discharged or fall forward." | |
| H. "[A]fter [the magazine is] loaded and inserted, the operator would then pull the . . . slide to the rear and release it, and . . . even if this hammer were in a forward position when they started, it's now cocked and held to the rear, so now I can simply . . . apply pressure to the trigger and discharge [the gun]." | |

4. <u>SUBJECT</u>:  The Slide.

| KEIL | THE BAILIFF |
|---|---|
| A. "The slide . .  is the part that moves back and forth on a semiautomatic firearm such as this.  It controls the operation of firing, | "[O]ne way" to pull the slide back is "to pinch it on both sides"—"[t]hat's why the slide has the little grooves, so you can get a |

the removal, extraction, and ejection of a fired cartridge case. That's the purpose of this slide mechanism as it comes to the rear, pulls that out, extracts and ejects that. As it comes forward, takes another live round off the magazine and chambers it."

B. While the gun is firing, "the expanding gas operates the top of the firearm known as the slide, . . . [the] slide moves to the rear, and what this does is pulls that fired cartridge case out of the chamber, extracts it and ejects it free of the firearm. As the slide gets all the way back and starts moving forward, it takes another live round, . . . and pushes it into the chamber at the same time recocking the hammer."

C. "At this point the firearm is in a cocked position because the slide has been to the rear."

D. "[A]fter [the magazine is] loaded and inserted, the operator would then pull the . . . slide to the rear and release it, and what this . . . movement does [is to cause] that first live round to be pushed up inside the magazine a little bit, and part of the slide mechanism actually pushes on the back of it and pushes it into the chamber, and what this accomplishes is even if this

hold of it to slide it back"—and move the slide in the direction of the back of the gun.

4

| | |
|---|---|
| hammer were in a forward position when they started, it's now cocked and held to the rear, so now I can simply, provided the safety is off, apply pressure to the trigger and discharge it." | |

5.  <u>SUBJECT</u>:  Time to Ready The Gun to Fire.

| <u>KEIL</u> | <u>THE BAILIFF</u> |
|---|---|
| "I tried sweeping the hammer down with my thumb, sweeping it [down] to see how fast I could disengage [the safety]. . . .  [¶] So with the natural movement of my thumb as I sweep it down, if I simply sweep my thumb down starting with . . . my thumb on top of the knurled lever, sweeping it and pulling it all the way down towards the grip, it frequently goes to a four- or five o'clock position, meaning that I can then pull the trigger." | In a response to one of the juror's questions, the bailiff stated during his demonstration that if one is proficient with the weapon, he or she could release the safety, pull back the hammer or the slide, and fire the gun "in a second." |

5