Filed 1/28/16  In re M.D. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re M.D., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>M.D.,<br><br>        Defendant and Appellant. | A141206<br><br>(Alameda County<br>Super. Ct. No. SJ13021413-01) |

M.D. (minor) appeals from an order of wardship entered pursuant to Welfare and Institutions Code section 602 following the juvenile court's finding that he committed a lewd act upon a child under the age of fourteen.  Minor contends that reversal of the juvenile court's jurisdictional finding is required for numerous reasons.  First, minor, who was thirteen years old at the time of the incident in question, asserts that his federal due process rights were violated because the prosecution did not rebut the presumption of criminal incapacity for a minor under the age of fourteen.  Second, he asks this court to review the victim's sealed academic and medical records to determine whether the juvenile court erred by failing to disclose any discoverable materials in violation of minor's rights to due process and confrontation.  Third, minor asserts that the juvenile court committed statutory error by viewing the crime scene outside of his presence and in

1

the absence of a waiver.  Minor also argues that certain of these errors were cumulatively prejudicial.

In addition, minor separately argues that the juvenile court abused its discretion at disposition by imposing unreasonable probation conditions prohibiting various types of gang involvement.  Minor also contends that these probation conditions were imposed in violation of his First Amendment rights.  Finally, in a companion petition for writ of habeas corpus, minor complains that the juvenile court improperly permitted a witness to make a blanket assertion of his right against self-incrimination, thereby violating minor's right to present a defense.[1]  We affirm the judgment.  Minor's petition for writ of habeas corpus has been summarily denied by separate order.

## I. FACTUAL BACKGROUND

### A.    *Introduction*

On August 6, 2013, the Alameda County District Attorney filed an original wardship petition under Welfare and Institutions Code section 602 alleging that minor committed felony rape (Pen. Code, § 261, subd. (a)(2)), felony forcible lewd and lascivious act against a child under the age of fourteen years (Pen. Code, § 288, subd. (b)(1)), and felony first-degree attempted burglary (Pen. Code, §§ 459, 664).

On November 20, 2013, the juvenile court made no finding on the rape allegation, but found the lewd act allegation true beyond a reasonable doubt.  On November 21, 2013, the court dismissed the attempted burglary allegation on the prosecutor's motion, with facts and restitution open.

On January 16, 2014, the juvenile court adjudged minor a ward of the court and placed him at home on probation.

### B.    *Respondent's Case*

#### 1.    *R. Doe*

R.D. attended junior high school in Newark, California, and was in the seventh grade.  She was twelve years old at the time of this incident.  M.D. was in R.D.'s sixth

---

[1] By order dated November 10, 2014, we indicated that minor's petition for writ of habeas corpus would be considered together with this appeal.

period science class. While R.D. was not close with M.D., she admits that she was good friends with him and liked him as a person. She also trusted him and felt comfortable being around him. One day in April of 2013 around 4:00 p.m., R.D. was alone after school waiting for her mother to pick her up. A few of M.D.'s friends approached R.D. on bicycles at the bottom of the staircase in the front of the school. R.D. only knew Francisco, Oscar, and M.D. of the four or five boys that approached her. R.D., not feeling afraid, walked up to the group and exchanged greetings with Francisco and M.D. After Francisco and R.D. embraced, M.D. and R.D. walked towards a big brick wall connected to the fence of the baseball field while the other boys stopped by the pool.

As they were walking towards the baseball field, R.D. and M.D. talked about R.D.'s cutting issues and her relationship with her girlfriend named Jasmine, whom she had been with since the beginning of the school year. R.D. has a sexual preference for girls. She also asked him, "how it is to, like, not really care about anything and not be so deep about things." M.D. sat down on the bleachers while R.D. was standing up. In the middle of their conversation, M.D. stood up and shoved her into the wall that was three or four feet behind her. He put his hands on her waist and forcefully pushed her against her will. R.D. did not flirt with M.D. and did not want to have any kind of sexual relations with him.

When M.D. pushed her up against the wall, she pushed him back telling him "no" and was trying her hardest to get him off of her. M.D. also kissed R.D. on the lips while restraining her by the waist. She did not kiss him back. M.D. then began touching her breasts underneath her clothing after pushing up her bra. R.D. told him to "stop" two to four times and told him "no" approximately two times. M.D. removed her belt and pulled her pants and underwear down to her ankles against her will and then restrained both her arms against the wall. She continued to try and push him away by pushing his shoulders. M.D. undid his pants and, bending down, inserted his erect penis into her vagina without a condom for at least one minute. M.D. was slanted toward her and moved his waist up and down. This incident occurred with both minors standing up.

3

R.D. stated she was a virgin at the time. She did not scream because she was embarrassed, felt weird, and no one was around since it was late after school.

R.D. stated that she saw Francisco by the pool before the assault occurred when she was talking to M.D. on the bleachers. She also knew that Francisco was by the pool during the assault, but did not see him. Still in shock, R.D. redressed herself. She then walked back towards the pool away from where M.D.'s friends were standing after the assault occurred. Four or five of the boys were still there, two of whom she recognized as Francisco and Jairo. R.D. subsequently walked to her friend Laynisha's house, but did not tell her about the sexual assault because she was still in shock and did not want anyone to know because she was embarrassed. She had confided in Laynisha in the past about her relationship with her girlfriend, Jasmine, and that she used to cut herself.

After the sexual assault, R.D. continued to go to school with M.D. in her science class, but the two never talked about the incident. At the end of the school year, R.D. passed her yearbook around and M.D. signed it. M.D. also wrote, "You've been really nice this year," adding "LOL" and "HMU" along with his number. "LOL" means "laugh out loud" and "HMU" stands for "hit me up." When R.D. saw his comment in her yearbook she felt that "it kind of hit me 'cause I had kept it to myself for the rest of the year. So the whole thing went through my head, and I tried to ignore it, but it just–it kind of–it made me, like–felt like an insult to me."

After the assault, R.D. was friendly with M.D. but never tried to call him. R.D. recalls telling her mother about the sexual assault at the end of June,[2] approximately two or three months after the sexual assault occurred. She told her that she was "raped" and that her arms were pinned. About one week after R.D. told her mother, she also told a therapist from the Child Abuse Listening, Interviewing, and Coordination Center ("CALICO") about the incident.

---

[2] According to R.D.'s mother, Julie M., R.D. actually told her mother about the incident on July 26, 2013. Officer Ramos subsequently took down Julie M.'s statement about R.D.'s disclosure to her the following day on July 27, 2013.

Approximately one week before the sexual assault, R.D. was briefly admitted to Willow Rock Center ("Willow Rock"). In fact, R.D. was confident about the timing of the sexual assault because she recalled that she was at Willow Rock the week before it happened. While at Willow Rock, R.D. told a psychiatrist that she was having a difficult time because she cheated on Jasmine, her girlfriend, with another girl named Cynthia T. R.D. said, "I felt like a bad person, I felt depressed and I just felt very, very guilty." She admitted to cutting herself and taking ibuprofen pills to hurt herself in the past because she felt guilty about cheating on Jasmine. R.D. was admitted to Willow Rock for a second time in July of 2013 for over one week. She told her mother about the sexual assault after the second Willow Rock visit.

R.D. said she considered Cynthia T. a close friend in whom she would confide. She did not consider Jessica D. as close of a friend, but more of a casual acquaintance.

### 2. Officer Randy Ramos

Officer Randy Ramos of the Newark Police Department met with R.D.'s parents on July 27, 2013, and took down their initial statements. On July 31, 2013, he also observed R.D.'s CALICO interview with a therapist through a one-way mirror and then subsequently met with R.D. Ramos made an in-court identification of M.D. as the minor he arrested on August 4, 2013. On the day of M.D.'s arrest, he brought the minor to the Newark Police Department where Ramos took his statement after reading him his Miranda rights.

During his testimony, Officer Ramos recounted his interview with M.D. When Officer Ramos asked minor who he had sex with at the junior high school, M.D. mentioned a girl other than R.D. In regard to the incident with R.D., minor said that he "made out" with her and massaged and sucked on her breasts. He repeatedly denied having sex with R.D. Minor confirmed that R.D. told him to stop approximately two or three times. M.D. further stated that he did not know why he did not stop making sexual advances on her when she told him to stop.

5

*C.*     *Defendant's Case*

    *1.*     *Julie M.*

R.D. disclosed the incident to her mother, Julie M., on July 26, 2013.  The following day, Julie M. met with Officer Ramos at the Newark Police Department and discussed what her daughter had revealed to her about the incident.  Specifically, Julie M. informed Officer Ramos that R.D. said Francisco led her out to the field where M.D. was located and then Francisco left.  R.D. also told her that M.D. "forced himself on her and held her and he was strong."  Julie M. stated:  "I know when she told me what had happened I didn't ask her for complete details.  I heard enough.  I heard what I needed to hear."  She said that R.D. did not tell her that she was pinned to the ground during the assault.  But, Julie believed she might have told Officer Ramos that R.D. was pinned to the ground because "that's probably something that I imagined happen[ed], but [R.D.] did not tell me those specific details, no."

    *2.*     *Jairo V.*

Jairo V. knew R.D. because they went to school together at the junior high school, but he did not consider her a close friend.  Jairo also knew M.D. and became friends with him in the sixth grade.   He remembered the incident occurring in the middle of March.  Jairo stated that M.D., Francisco, and Oscar all met up at the flag pole after school that day at approximately 2:45 p.m.   Jairo saw R.D. with Jessica and Cynthia later that day around 4:00 p.m.  Jairo, M.D., Oscar, Francisco, R.D., and Jessica were by the pool at this time.  Cynthia left for softball practice.  Jairo testified that R.D. was acting normal towards M.D. when the group was talking.  At some point, M.D. and R.D. left together without informing the rest of the group that they were leaving.  Jairo told Francisco and Oscar that he wanted to go spy on them.

Jairo said M.D. and R.D. were walking toward the dugout area of the baseball field, but then he lost sight of them.  He went with his iPod and turned on the camera to film them.  Jairo saw a shadow of M.D. and R.D. leaning on the wall and they were making out and kissing.  He estimates he was about seven feet away from them when they were kissing and that is the only kind of physical contact he saw.  He also saw R.D.

up against the wall. Then, he went around the dugout to get a better angle on them. He believed that M.D. and R.D. never saw him at any point while he was spying on them. Jairo only observed them talking about Jasmine after he moved positions.

After their conversation, Jairo saw R.D. and M.D. walking together towards the pool area. Jairo then saw R.D. and M.D. meet up with the rest of the group made up of Francisco, Oscar, Jessica, and himself. Jairo noticed that R.D. was acting normal as if nothing happened and was not upset when she returned to the group. Then, R.D., Jessica, and Cynthia left together around 4:30 p.m. after saying good-bye to everyone. Jairo estimates that M.D. and R.D. were alone for six to seven minutes. Jairo also told an investigator that he saw R.D. and M.D. hug each other good-bye.

On cross-examination, Jairo testified that he was at M.D.'s grandmother's house when M.D. was arrested. He did not know what M.D. was arrested for at the time, but later found out while eavesdropping on M.D.'s aunt and his parents that M.D. was arrested for conduct related to the incident in question. Jairo stated that he showed the video he filmed to M.D., but deleted it a week or two after the incident. He erased the video because "there was nothing interesting on there." Jairo never saw R.D. hanging out with M.D. after the incident and did not pay attention to R.D.'s attitude for the rest of the school year. He did not see anything that caused him to be alarmed when he saw M.D. and R.D. at the dugout.

### 3. *Francisco R.*

M.D. intended to present Francisco as a witness at trial. The court appointed counsel for Francisco because of an attempted burglary charge involving M.D., Francisco, and Jairo and the prosecution's theory that Francisco acted as a crime partner, lookout and aider and abettor during the sexual assault. Francisco spoke with his attorney, who advised him of his rights, and thereafter he elected to invoke his privilege against self-incrimination with respect to any questions about the day of the incident and his presence there.

7

### 4. *Jessica D.*

Jessica D. testified that she knew R.D. better than most of her friends because R.D. came to her more than other people to talk about her problems. They would hang out three to four times per week at school back when Jessica went to the junior high school. She also knew M.D. through school and friends. One day in April, Francisco, M.D., and Jairo approached Jessica, Cynthia, and R.D. after school. Cynthia left to go to baseball practice and then the group walked by the tennis courts. R.D. and M.D. then left the group to go to the bleachers while the rest of the group walked the other way towards the baseball fields and into the dugout. Jessica never saw anything that happened between R.D. and M.D. around the baseball field. Approximately ten minutes later, M.D. met up with Francisco and R.D. rejoined with Jessica. M.D. and R.D. said goodbye to each other in a friendly way and acted perfectly fine around each other according to Jessica.

R.D. and Jessica walked on one side of the tennis courts while Francisco and M.D. walked on the other. At this time, R.D. told Jessica that "she felt bad because she cheated on Jasmine" with M.D. and "that [M.D.] and her made out and she let him go up her shirt and he tried to go in her pants, but she said no and then that's when he stopped." Jessica thought R.D.'s tone of voice was normal and not depressed, but that she kept staring at the ground and was kind of frustrated.

Jessica testified that R.D. once told her that she had sexual intercourse with someone in sixth grade, a year before the incident with M.D. Jessica also never saw R.D. hang out with M.D., except for the day when the incident occurred. She did not see them hang out at any time after the incident. Jessica never knew R.D. to be untruthful. She knew that R.D. dated Jasmine and Cynthia in the past. One day after the incident, Jessica saw R.D. with Jasmine and noticed that R.D. acted like her normal self.

### 5. *Cynthia T.*

Cynthia T. knew M.D. and R.D. because they all went to junior high school together. Cynthia and R.D. "were really good friends at one point." They also dated for approximately two weeks and were friends for six months, but were no longer friends at

the time of the hearing. R.D. told her when they were friends that she had a crush on M.D. "at the very beginning of the school year but she didn't anymore." She also told Cynthia that she was bisexual. Cynthia observed R.D. having a romantic relationship with a boy named Riley C., who also went to the junior high school. Specifically, Cynthia saw them holding hands at school more than once but less than five times in the past, and Riley talked to Cynthia about his relationship with R.D.

Cynthia remembered the day in question and stated that Jessica, Francisco, Jairo, Oscar, R.D., and M.D. were hanging out in front of school by the school sign. Cynthia confirmed she left for baseball practice around 3:45 p.m. that day. She recalled R.D. not specifically interacting with M.D., but talking together with the whole group. Francisco and Jessica left from the group conversation first and went to the baseball fields together. Then, Cynthia and R.D. left for the restroom so that Cynthia could change her clothes for baseball practice. As she was about to leave for practice, she also saw Jairo, Oscar, and M.D. standing by the sign. Cynthia never saw M.D. alone with R.D.

### 6. Officer Randy Ramos

Officer Ramos took Julie M.'s statement on July 27, 2013, regarding the sexual assault. According to Ramos, Julie M. said that R.D. told her M.D. pinned her down on the ground and sexually assaulted her.

## D. Rebuttal

### 1. Assistant Principal Rosewood

Rosewood was the assistant principal at the junior high school. On September 13, 2013, she searched Jairo V.'s backpack and found two computers that belonged to the school. She contacted the police, filed a report, and suspended Jairo five days for stealing.

### 2. Officer Jeffrey Revay

Officer Revay responded to a report of stolen computers at the junior high school on September 13, 2013. He was contacted by Assistant Principal Rosewood and was informed that Francisco R. and Jairo V. were the responsible parties involved. Jairo told Officer Revay that, when the two stolen Mac Mini laptops were discovered in his

backpack, he had been returning them to the school because he had knowledge that they were stolen from the school's computer lab. He also told Officer Revay that he had initially planned to sell the computers for profit before he decided that he wanted to return them to the school. Officer Revay arrested Jairo for felony possession of stolen property. Jairo did not admit to stealing the computers from the school, but refused to identify who actually stole them because "he was not going to rat on the kid."

## E.     *Conclusion and Disposition*

On November 20, 2013, the juvenile court indicated it had reasonable doubt on the Penal Code section 261, subdivision (a)(2) rape allegation, but found true beyond a reasonable doubt that minor committed a lewd act in violation of Penal Code section 288, subdivision (b)(1).

On December 6, 2013, at minor's dispositional hearing, the juvenile court released M.D. from juvenile hall to his family on electronic GPS monitoring; ordered minor to attend a different middle school; required no contact with the victim, her family members or any of the witnesses; and ordered minor to undergo a guidance clinic evaluation. The court also made clear that M.D. should have no contact with Francisco, Oscar, or Jairo, stating: "I don't want you around those three guys. They seem like a bunch of trouble when you're together." The juvenile court was willing to release minor on electronic monitoring because the court reasoned that "this is not a kid that I think is going to be a criminal in his life." However, he instructed the minor that if "someone says no, it means no."

At the continued dispositional hearing on January 16, 2014, the juvenile court adjudged minor a ward of the court and placed him at home with his mother under certain conditions of probation. Included among these probation conditions were several prohibiting gang association and affiliation. On March 4, 2014, minor filed a timely notice of appeal.

10

## II. DISCUSSION

### A.  *Minor Understood the Wrongfulness of his Conduct*

Minor first argues that the juvenile court erred in failing to make a finding, by clear and convincing evidence, that he understood the wrongfulness of the sexual misconduct at issue.  Pursuant to Penal Code section 26, "All persons are capable of committing crimes except those belonging to the following classes:  [¶]  One—Children under the age of 14, in the absence of clear proof that at the time of committing the act charged against them, they knew its wrongfulness."  This statute "articulates a presumption that a minor under the age of 14 is incapable of committing a crime."  (*In re Manuel L.* (1994) 7 Cal.4th 229, 231.)  The presumption applies in proceedings under Welfare and Institutions Code section 602.  (*Id*. at p. 232.)

Thus, when a child under the age of fourteen is charged with a crime, the prosecution must prove by clear and convincing evidence that the minor understood the wrongfulness of his or her conduct.  (*In re Jerry M.* (1997) 59 Cal.App.4th 289, 297 (*Jerry M.*).)  In making such a determination of capacity, the court must often rely on circumstantial evidence, "including the minor's age, experience and understanding, as well as the circumstances of the offense including its method of commission and concealment."  (*Id*. at p. 298; see *In re Paul C.* (1990) 221 Cal.App.3d 43, 52 (*Paul C.*).)  With respect to a minor's age, " '[i]t is only reasonable to expect that generally the older a child gets and the closer [he or she] approaches the age of 14, the more likely it is that [he or she] appreciates the wrongfulness of [his or her] acts.' "  (*Paul C.*, *supra*, 221 Cal.App.3d at p. 53; see *In re Cindy E.* (1978) 83 Cal.App.3d 393, 399 (*Cindy E.*) [noting that child's age is a "basic and important consideration"].)

Here, minor—who was thirteen years and four months of age at the time of the charged offense—correctly states that the juvenile court did not make an express finding that he understood the wrongfulness of his conduct.  However, we will affirm a juvenile court's implied finding of capacity if it is supported by substantial evidence.  (*Jerry M.*, *supra*, 59 Cal.App.4th at pp. 297-298.)  Specifically, we will "review the whole record most favorably to the judgment to determine whether there is substantial evidence—that

is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could have made the requisite finding under the governing standard of proof." (*Id*. at p. 298.)

Applying these principles, we conclude that substantial evidence supports the juvenile court's implied finding that M.D. understood the wrongfulness of his conduct. As stated above, minor was thirteen years and four months old at the time of the incident in question. He was thus more likely to appreciate the wrongfulness of his act because he was approaching fourteen years of age. (*Cindy E.*, *supra*, 83 Cal.App.3d at p. 399.) Furthermore, the particular method of the act's commission and its concealment indicate that minor appreciated the wrongfulness of his conduct. (Cf. *Paul C.*, *supra*, 221 Cal.App.3d at p. 52.) The sexual misconduct occurred in a secluded area near the baseball fields. This indicates that minor attempted to conceal his conduct from the group of friends. Moreover, knowledge of wrongfulness can be inferred from the circumstances of the offense. (See *ibid*.) M.D.'s use of physical force to push R.D. against the wall as well as his continued efforts to restrain her hands against the wall after becoming aware of her negative reaction to his sexual advances support an inference that minor understood he was wrongfully acting against R.D.'s will.

With respect to experience and understanding, minor thoroughly reviews his interview with Officer Ramos on August 4, 2013, at the Newark Police Department. He argues that his statements throughout the interview show convincingly that he did not appreciate the wrongfulness of his conduct. We find the exact opposite. Minor told Officer Ramos that he was sexually active, having had sexual intercourse with another girl at the junior high school. He clearly and repeatedly expressed his understanding of the differences between sexual intercourse and other types of sexual conduct, stating, for instance, that he didn't make love to R.D., but he did suck on her "titty." Further, minor admitted that, although R.D. told him to stop two or three times, he failed to do so. And, when Officer Ramos asked, "O.k. So why didn't you just stop dude?," minor replied, "Hmm. I'm not sure." This is a clear indication that minor realized that he should have stopped under such circumstances and had no valid explanation for his misconduct in

12

failing to do so.  Viewing the record in the light most favorable to the judgment, we find substantial evidence that M.D. appreciated the wrongfulness of his conduct for purposes of Penal Code section 26.

In reaching this conclusion, we note that, throughout his argument, minor conflates two distinct issues:  whether he actually committed the assault (i.e., whether their activity was consensual) and whether he had the capacity to understand that such an assault is wrong.  Here, we are concerned only with the capacity issue, and thus many of the arguments minor makes are irrelevant.  Moreover, despite minor's invitation to do so, we do not consider the contents of minor's psychological evaluation in making our capacity determination, as that evaluation was not before the juvenile court at the time it made its jurisdictional finding.  (Cf. *Paul C.*, *supra*, 221 Cal.App.3d at p. 53.)  Indeed, were we to consider it, it would only buttress our determination that minor had an understanding of the dynamics of sexual relations sufficient to support a finding of capacity under Penal Code section 26.

Finally, we reject minor's suggestion that we remand this case, even if we find substantial evidence that he understood the wrongfulness of the conduct at issue, so that the juvenile court can make its own express finding.  Minor's proposal flies in the face of the existing case law which holds that "we must affirm an implied finding that the juvenile understood the wrongfulness of his conduct if the implied finding is supported by substantial evidence."  (*Jerry M.*, *supra*, 59 Cal.App.4th at pp. 297-298, fn. omitted; *In re Cindy E.*, *supra*, 83 Cal.App.3d at pp. 398-399; *In re Marven C.* (1995) 33 Cal.App.4th 482, 486-487.)  Minor's attempts to distinguish this clear precedent are unavailing.  We see no grounds for remand.

### B.  *R.D.'s Medical and Academic Records*

Minor next contends that the juvenile court violated his federal due process and Sixth Amendment confrontation rights to the extent it failed to disclose certain confidential records related to R.D.'s credibility.  He asks us to conduct an independent review of R.D.'s sealed medical and educational records to determine whether any such error occurred.  Respondent does not object to our review of R.D.'s sealed records in

order to confirm the juvenile court's ruling.

The records at issue were produced in response to minor's subpoenas to Willow Rock and the Newark Unified School District for R.D.'s medical and school records, respectively. As stated above, R.D. was admitted to Willow Rock for three days one week prior to the incident in question. She was again admitted to Willow Rock for over a week in July, approximately two to three months after the charged offense occurred. Minor requested that the juvenile court conduct an in camera review to determine if the records should be disclosed to minor under his Sixth Amendment right of confrontation.

On October 18, 2013, the juvenile court found no discoverable information in regard to the Newark school records. Specifically, the court stated: "And we have the issue of the records from his school. So I have gone through those quite thoroughly, and there is absolutely nothing in there that is discoverable and that is even close to applying to this case." On October 29, 2013, the court reviewed the Willow Rock records and concluded: "So I have reviewed all of the documents that were provided in two separate envelopes by the Willow Rock Adolescent Treatment Center. There is absolutely nothing that is discoverable in these records that I found to be even close to being associated with this case. Let me say it that way."

On November 1, 2013, the juvenile court reviewed the Willow Rock records for a second time and stated that "at this time, in mind of all of the testimony I heard from the complaining witness last week—not last week, but earlier this week—and in that review, I've discovered a very brief sentence, if you will—yes, a sentence—in one of the records that could be valuable in this case." On November 4, 2013, both parties stipulated that the relevant information in the records was dated March 26, 2013.

A witness's mental illness or emotional instability can be relevant to his or her credibility. (*People v. Gurule* (2002) 28 Cal.4th 557, 591-592 (*Gurule*); *People v. Herring* (1993) 20 Cal.App.4th 1066, 1072; see also *People v. Anderson* (2001) 25 Cal.4th 543, conc. opn. p. 608.) A witness may be cross-examined on such credibility if such illness affects the witness's ability to perceive, recall or describe the events in question. (*Gurule*, *supra*, 28 Cal.4th at pp. 591-592.) However, the extent to which the

14

Constitution requires disclosure of private psychiatric records to aid in such cross-examination is the subject of some dispute.

Under a due process analysis, "[i]t is well settled that the government has the obligation to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment." (*Pennsylvania v. Ritchie* (1987) 480 U.S. 39, 57 (*Ritchie*); *United States v. Agurs* (1976) 427 U.S. 97; *Brady v. Maryland* (1963) 373 U.S. 83, 87.) For purposes of this disclosure rule, information is deemed material " 'only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.' " (*Ritchie*, *supra*, 480 U.S. at p. 57.) Moreover, where there is no clear state policy requiring absolute confidentiality of the records in question, the public interest in protecting this type of sensitive information gives way to the due process needs of the defendant to obtain information material to his or her defense. (*Id*. at pp. 57-58.)

However, in *People v. Webb* (1993) 6 Cal.4th 494 (*Webb*), the California Supreme Court questioned whether records related to voluntary treatment by private or county therapists—like the records at issue in this case—"can be deemed 'in the possession' of the 'government' in the manner assumed by *Ritchie*." (*Webb*, *supra*, 6 Cal.4th at p. 518.) Specifically, the *Webb* court opined: "The records were not generated or obtained by the People in the course of a criminal investigation, and the People have had no greater access to them than defendant. Given the strong policy of protecting a patient's treatment history, it seems likely that defendant has no constitutional right to examine the records even if they are 'material' to the case." (*Ibid*.) With respect to a defendant's Sixth Amendment rights in this context, the *Webb* court noted: "Simply stated it is not clear whether or to what extent the confrontation or compulsory process clauses of the Sixth Amendment grant pretrial discovery rights to the accused." (*Id*. at pp. 517-518.)

Thereafter in *People v. Hammon* (1997) 15 Cal.4th 1117, the California Supreme Court "decline[d] to extend the defendant's Sixth Amendment rights of confrontation and cross-examination to authorize pretrial disclosure of privileged information." (*Id*. at

15

p. 1128.) In a case involving facts similar to the present proceedings, the *Hammon* court concluded that a trial court is "not required, at the pretrial stage of the proceedings, to review or grant discovery of privileged information in the hands of third party psychotherapy providers." (*Id*. at p. 1119.) The court left open, however, the question of whether such materials must be reviewed and potentially made available at trial in order to vindicate a defendant's Sixth Amendment rights. (*Id*. at pp. 1125-1128.)

The breadth of a defendant's trial right to cross-examination under the Confrontation Clause of the Sixth Amendment was instead discussed in another California Supreme Court decision, *People v. Quartermain* (1997) 16 Cal.4th 600, issued the next month. Specifically, the *Quartermain* court opined as follows: "Although the right of confrontation includes the right to cross-examine adverse witnesses on matters reflecting on their credibility, 'trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination.' [Citation.] In particular, notwithstanding the confrontation clause, a trial court may restrict cross-examination of an adverse witness on the grounds stated in Evidence Code section 352. [Citation.] A trial court's limitation on cross-examination pertaining to the credibility of a witness does not violate the confrontation clause unless *a reasonable jury might have received a significantly different impression of the witness's credibility had the excluded cross-examination been permitted*. [Citations.]" (*Id*. at pp. 623-624, italics added.) The decision in *Quartermain* is in accord with the general tenet that " '[t]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' " (*People v. King* (2010) 183 Cal.App.4th 1281, 1314.)

Although we find the *Quartermain* approach on this issue to be the more analytically appropriate, we have reviewed the sealed records in this case to determine if they contain any disclosable information under either the *Ritchie* due process standard or the Sixth Amendment paradigm articulated in *Quartermain*. We conclude that there is no disclosable information in R.D.'s Willow Rock or Newark records that has not already been released to minor. There was no error.

*C.*     *Viewing of the School Grounds*

Minor also argues that the juvenile court committed statutory error by visiting the scene of the charged offense in his absence and without an appropriate waiver of his presence. The juvenile court described the school visit at issue as follows: "On Friday, November 15th, I, the court, both counsel, Ms. Backers and Ms. McCannon, the court clerk and the bailiff drove to [the junior high school]. We arrived there, met with a couple of the administrators, drove through part of the campus to an area by a baseball field, got out of our van, looked around several baseball diamonds, drove around the other part of the school, looked around there, and returned to our court. And the purpose of that was for everyone to visit the scene and get a better idea of what everything looked like in person."

In the criminal context, a defendant has the statutory right to be present during portions of the trial when evidence is taken before the trier of fact. (Pen. Code, § 977, subd. (b)(1) & 1043, subd. (a); *People v. Blacksher* (2011) 52 Cal.4th 769, 798-799 & fn. 16 (*Blacksher*); *People v. Concepcion* (2008) 45 Cal.4th 77, 81-82 (*Concepcion*); *People v. Johnson* (2013) 221 Cal.App.4th 943, 948, 954-955 (*Johnson*).) As one example, the accused has a right to be present when the trier of fact visits a crime scene. (*People v. Garcia* (2005) 36 Cal.4th 777, 781, 797-798; see *People v. Bush* (1886) 68 Cal. 623, 631-634.) This is because a fact finder receives evidence when it views the scene of the alleged offense. (*People v. Bolin* (1998) 18 Cal.4th 297, 325; see also Pen. Code, § 977, subd. (b).)

"The right to be present may be waived, however." (*Concepcion*, *supra*, 45 Cal.4th at p. 82.) For instance, pursuant to Penal Code section 977, subdivision (b)(2), a defendant "may execute a written waiver of his or her right to be personally present, approved by his or her counsel, and the waiver shall be filed with the court." In addition, it has been held that defense counsel may properly waive the defendant's presence so long as there is evidence that the defendant consented to the waiver. (See *People v. Davis* (2005) 36 Cal.4th 510, 532 (*Davis*).) "At a minimum, there must be some evidence that the defendant understood the right he was waiving and the consequences of

doing so." (*Davis*, *supra*, 36 Cal.4th at p. 532; see *Johnson*, *supra*, 221 Cal.App.4th at p. 957.)

Here, as respondent acknowledges, the record is silent as to whether the court obtained a waiver of minor's presence from minor. Indeed, the juvenile court's settled statement filed with this court on May 26, 2015, states definitively that minor "was not advised on the record of his right to be present and did not enter a waiver of his right to be present." Therefore, we cannot conclude that minor knowingly and intelligently waived his right to presence at the viewing. (Cf. *Johnson*, *supra*, 221 Cal.App.4th at p. 957.)

Even in the face of such an error, however, a defendant bears the burden of " 'demonstrating that his absence prejudiced his case or denied him a fair trial.' " (*Blacksher*, *supra*, 52 Cal.4th at p. 799.) Specifically, in the context of the statutory error complained of by minor, reversal is only warranted "if there is a reasonable probability that the result would have been more favorable to defendant without the error." (*People v. Davis* (2009) 46 Cal.4th 539, 611.) Under this standard and the particular circumstances of this case, we conclude that any such error was harmless.[3]

Specifically, we find no reversible error because minor "provides no basis on which one could conclude the result of his trial would have been different" if he had attended the juvenile court's school visit. (Cf. *People v. Moon* (2005) 37 Cal.4th 1, 21.) Rather, minor argues that, had he been allowed to attend the school visit, it might have triggered something in his mind that would have helped explain Jairo's testimony or further undermine R.D.'s credibility. Had the juvenile court found true the charged rape

---

[3] For purposes of this analysis, we will assume without deciding that the mandates of Penal Code section 977 are applicable in the context of a juvenile delinquency proceeding under Welfare and Institutions Code section 602. (See Welf. & Inst. Code, § 203 [a proceeding in juvenile court shall not be deemed a criminal proceeding]; see *City of San Jose v. Superior Court* (1993) 5 Cal.4th 47, 53-54 [noting that although the procedural safeguards guaranteed to adult criminal defendants are not applied ipso facto in delinquency matters, the civil label " 'cannot obscure the quasi-criminal nature of juvenile proceedings, involving as they often do the possibility of a substantial loss of personal freedom' "].)

18

allegation, we might conclude differently. However, with respect to the lewd act allegation that is at issue in these proceedings, further attacks on R.D.'s credibility or explanation of Jairo's testimony would have been of little use to minor's defense. Jairo's testimony was, at best, inconclusive with respect to the consensual nature of the sexual contact between R.D. and minor. And, R.D.'s version of events was, as we have previously discussed, corroborated by minor, himself. Specifically, he admitted that he massaged and sucked on her breasts; that she said no two or three times; and that he didn't know why he didn't stop when she said no. Given these facts, any error with respect to the handling of the school visit was manifestly harmless.

### D.  Cumulative Error

Minor also argues that the cumulative impact of several of the errors he raises on appeal requires reversal of the juvenile court's jurisdictional finding. Specifically, he asserts that the combined prejudice he suffered based on the improper site visit and the juvenile court's failure to provide him appropriate access to R.D.'s confidential records critically impacted his ability to undermine R.D.'s credibility. However, because we have concluded that the only error identified with respect to these issues was not prejudicial, we also find that there was no cumulative prejudice to minor. (See *People v. Riel* (2000) 22 Cal.4th 1153, 1215 [rejecting the argument that the court committed cumulative error where there was "no error that, even in cumulation, was prejudicial"].)

### E.  Gang-Related Probation Conditions

At disposition, the trial court imposed various gang-related conditions on M.D.'s probation. The court ordered M.D. "not to belong to any criminal street gang or associate with anyone you know or should reasonably know is a member of a criminal street gang." M.D.'s attorney objected to this probation condition saying, "Judge, just for the record, I am objecting to that condition. I don't think he's involved with any gangs." The court replied: "It looks to me like he is from the burglary case; not so much from the case here but the case that was dismissed." M.D. was next told "not to wear gang clothing, colors or emblems or get any tattoos or piercings." Lastly, the court ordered M.D. "not to acquire any new tattoos or gang-related piercings and have any existing tattoos or

19

piercings photographed as directed by the probation officers." M.D.'s attorney, however, lodged no further objection.

Minor argues that the juvenile court abused its discretion when it imposed the probation conditions prohibiting gang involvement because they were unreasonable under the factors set forth in *People v. Lent* (1975) 15 Cal.3d 481, 486 (*Lent*), superceded on other grounds as stated in *People v. Wheeler* (1992) 4 Cal.4th 284, 290-292. He also contends that the gang-related conditions violated his rights under the First Amendment of the Constitution. We begin by indicating which issues have properly been preserved for review.

"There is a strict interpretation of the rule of forfeiture under which a probationer 'who contends a condition of probation is constitutionally flawed still has an obligation to object to the condition *on that basis* in the trial court in order to preserve the claim on appeal.' [Citation.] *Gardineer*'s rule requires not only objection but a listing of any constitutional grounds for the objection." (*People v. Brandão* (2012) 210 Cal.App.4th 568, 572 (*Brandão*), quoting *People v. Gardineer* (2000) 79 Cal.App.4th 148, 151.) Here, minor's counsel merely objected to the probation condition because he did not "think he's involved with gangs." The attorney did not raise any constitutional concerns. Moreover, this is not a case that falls into the exception to forfeiture for constitutional claims which present pure questions of law that can be resolved without reference to the particular sentencing record developed in the trial court. (See *In re Sheena K.* (2007) 40 Cal.4th 875, 889 (*Sheena K.*).) Rather, addressing minor's concerns would require review of his past history as well as the details of his current offense, all contained in the factual record developed in the juvenile court. Since M.D.'s attorney did not expressly object on any constitutional basis and this case does not fall within the ambit of *Sheena K.*, we find that minor has forfeited the opportunity to challenge the gang-related conditions on First Amendment grounds.

In reaching this conclusion, we find minor's reliance on *Brandão* unavailing. In that case, the court determined that "counsel was able only to begin her objection" to the probation condition at issue and that "[s]he uttered scarcely more than a few words before

20

the trial court explained that it was uninterested in a challenge to the no-gang-contact provision." (*Brandão*, *supra*, 210 Cal.App.4th at p. 572.) Under such circumstances, the court determined that the defendant did not have a chance to fully state all of the possible grounds for objection before being cut off by the sentencing court and thus did not forfeit the issue on appeal. (*Id*. at pp. 572-573.) We disagree with minor's characterization of the scenario in *Brandão* as "virtually identical" to the instant matter. Here, minor's counsel did not utter just a few words. Rather, she made it clear that she fully objected to the probation condition "just for the record." Without an objection on constitutional grounds and no evidence that minor was prevented from fully stating his objection, we must uphold *Brandão*'s "strict interpretation of the rule of forfeiture" and thus do not reach the merits of minor's First Amendment claim. (*Id*. at p. 572.)

Even though minor forfeited his First Amendment contentions, he did preserve the issue of reasonableness with respect to the gang affiliation condition by objecting to that condition in the juvenile court. (See *In re Justin S.* (2001) 93 Cal.App.4th 811, 814.) However, his objection was limited to that single condition and was not renewed in the context of the other two gang-related conditions. Thus, we deem his reasonableness challenge to be limited solely to the issue of whether the juvenile court's order requiring M.D. "not to belong to any criminal street gang or associate with anyone you know or should reasonably know is a member of a criminal street gang" was reasonable.

A juvenile court retains broad discretion in imposing probation conditions for the purpose of rehabilitating the juvenile offender. (*In re G.V.* (2008) 167 Cal.App.4th 1244, 1250; *In re Babak S.* (1993) 18 Cal.App.4th 1077, 1084.) A juvenile court has the authority to "impose and require any and all reasonable conditions that it may determine fitting and proper to the end that justice may be done and the reformation and rehabilitation of the ward enhanced." (Welf. & Inst. Code, § 730, subd. (b).) "A juvenile court . . . may even impose a condition of probation that would be unconstitutional or otherwise improper so long as it is tailored to specifically meet the needs of the juvenile." (*In re Josh W.* (1997) 55 Cal.App.4th 1, 5; see *In re Tyrell J.* (1994) 8 Cal.4th 68, 81, overruled on different grounds in *In re Jaime P.* (2006) 40 Cal.4th 128, 130, 139; see *In*

*re Laylah K.* (1991) 229 Cal.App.3d 1496, 1500, disapproved on separate grounds in *In re Sade C.* (1996) 13 Cal.4th 952, 962, fn. 2, 983, fn. 13.) In determining the conditions of probation, "the juvenile court must consider not only the circumstances of the crime but also the minor's entire social history." (*In re Todd L.* (1980) 113 Cal.App.3d 14, 20. (*Todd L.*).)

But, a trial court's broad discretion to impose conditions of probation is not endless. (*People v. Lopez* (1998) 66 Cal.App.4th 615, 624 (*Lopez*).) Rather, pursuant to *Lent*, a probation condition will be deemed unreasonable and therefore invalid if it " '(1) has no relationship to the crime of which the offender was convicted, (2) relates to conduct which is not in itself criminal, and (3) requires or forbids conduct which is not reasonably related to future criminality.' " (*Lent, supra*, 15 Cal. 3d at p. 486.) All three factors must be met in order to invalidate a condition of probation. (*In re R.V.* (2009) 171 Cal.App.4th 239, 246.) Thus, even if a probation condition is unrelated to the "crime of which a defendant was convicted and involves conduct that is not itself criminal, the condition is valid as long as the condition is reasonably related to preventing future criminality." (*People v. Olguin* (2008) 45 Cal.4th 375, 379-380.) We review a juvenile court's imposition of probation conditions for a "manifest abuse of discretion." (*In re G.V., supra*, 167 Cal.App.4th at p. 1250; *In re Josh W., supra*, 55 Cal.App.4th at p. 5; *In re Abdirahman S.* (1997) 58 Cal.App.4th 963, 969.)

Applying the standards articulated in *Lent*, we find that the juvenile court did not abuse its discretion in imposing the probation conditions prohibiting gang affiliation. In making this determination, we need not consider the first two *Lent* factors because we conclude, under the third *Lent* factor, that the gang affiliation condition here at issue forbids conduct that is reasonably related to future criminality. "Because '[a]ssociation with gang members is the first step to involvement in gang activity,' such conditions have been found to be 'reasonably designed to prevent future criminal behavior.' [Citation.] Whether the minor was currently connected with a gang has not been critical. Thus, probation terms have been approved which bar minors from being present at gang

gathering areas, associating with gang members, and wearing gang clothing.  [Citation.]"
(*Lopez*, *supra*, 66 Cal.App.4th at p. 624.)

Finally, M.D.'s reliance on *Brandão* is again misplaced.  The *Brandão* court held that the trial court abused its discretion in imposing gang-related probation conditions on an adult probationer because the record showed "(1) no ties between defendant and any criminal street gang, (2) no such ties involving any member of defendant's family, and (3) no criminal history showing or strongly suggesting a gang tie." (*Brandão*, *supra*, 210 Cal.App.4th at p. 576.)  In contrast, M.D. is a minor, and a juvenile court has broad discretion to impose conditions for the purpose of a minor's rehabilitation.  (*In re G.V.*, *supra*, 167 Cal.App.4th, at p. 1250.)  Indeed, "[a] condition of probation which is impermissible for an adult criminal defendant is not necessarily unreasonable for a juvenile receiving guidance and supervision from the juvenile court." (*Todd L.*, *supra*, 113 Cal.App.3d at p. 19.)  Given minor's recent involvement with friends involved in criminal activity (both the attempted burglary and the theft of school computers), the gang affiliation condition represented appropriate guidance from the juvenile court, despite the absence of current gang involvement.  Accordingly, minor fails to show that the juvenile court committed an abuse of discretion in imposing the gang-affiliation probation conditions.

### III. DISPOSITION

The judgment is affirmed.[4]

---

[4] In his related habeas petition, A143436, minor challenges the juvenile court's determination that Francisco R. properly asserted his constitutional right against self-incrimination.  Having determined that the petition does not state a prima facie case for relief, we have today summarily denied it by separate order of this court.  (See *People v. Romero* (1994) 8 Cal.4th 728, 737.)

_____

REARDON, ACTING P.J.


We concur:


_____

RIVERA, J.


_____

STREETER, J.


*In re M.D.* A141206

24